## WILLIAM JACKSON *vs.* THE AMERICAN BARKENTINE "ENCORE."

### January 23, 1905.

*Injury to Servant.—Negligence of Master.—Burden of Proof:* Where there is evidence of negligence of the employer in relation to an accident resulting in injury to the employe, the burden of proof is on the employer to show injury was not due to negligence.

*Same.—Condition of Tackle as Evidence.—Latent Defect.—Inevitable Accident:*    Unsatisfactory condition of piece of rope introduced in evidence, together with the fact of the breakage of the rope whereby libellant received injury, and evidence of some negligence as to its care, places on the ship the burden of accounting for the breakage from latent defect or some cause beyond its control, though using ordinary care and diligence in its preservation.

*Proximate Cause.—Latent Tendency:*  If personal injuries are the

direct cause of a diseased condition, they may be regarded as the proxi-
mate cause thereof, even though there was a pre-existing or latent tend-
ency in the system of the injured person toward such diseased condition.

*Predisposition to Disease.—Damages for Injury Causing such Pre-
disposition to Develop:* A predisposition to a certain disease in the sys-
tem of a person who receives an injury which causes such disease to
break out, does not deprive him of his right to damages for such injury.

*Reasonable Inference:* Where disease develops in an injured part of
the body shortly after the happening of the injury, and which is of such
a nature that it might develop from such injury, it is a reasonable infer-
ence that it was induced by such injury.

In Admiralty: Libel *in Rem* for Damages for Personal
Injuries.

J. J. Dunne, Proctor for Libellant.

A. S. Humphreys, Proctor for Libellee.

DOLE, J. This is a libel *in rem* against the barkentine
"Encore," in a cause of damages, civil and maritime, in which
the libellant alleged shipping on the vessel at South Bend, in
the State of Washington, for a voyage to the port of Sydney in
Australia, thence to the port of Newcastle in Australia, and
thence to a final port of destination on the Pacific Coast of
North America, either direct or via the Hawaiian Islands; and
that upon leaving Newcastle, while the crew was engaged in
hauling at the clew of the foretop-gallant-sail, the libellant
being stationed on the main-stay about five feet from the deck,
the foretop-gallant-sheet on which they were hauling, broke near
the quarter block, by which accident libellant fell to the deck
and injured one of the fingers of his left hand, in consequence
whereof the disease of synovitis attacked said finger and has
developed into chronic synovitis, and is painful, preventing
him sometimes from sleeping and disabling him to such an ex-
tent that he believes himself unable to procure further employ-
ment as a mariner, which injury he alleges was caused by the
carelessness and negligence of the said ship and her owners in
failing to provide suitable and safe sheets for the use of the

crew in doing the work of the said vessel, and that his wages were twenty-five dollars a month.

The answer denies that the breaking of the said sheet was in anywise due to carelessness or negligence of the said vessel and her owners, or that the said sheet was rotten, unsafe, defective or insufficient for the uses for which it was designed, or that the same had not been overhauled and examined by the said barkentine and her owners, and alleges that it was the custom of the said barkentine to overhaul her tackle, ropes and equipment, including such sheet, at least once a week, and said examination was strictly observed and followed at all the times mentioned; that the said sheet had not been used more than eight months when the same broke; that it was of good quality Manila and of sufficient size for the purposes for which it was intended, and was apparently sound, safe and sufficient; and that the breaking of the same was due to some inherent, latent defect thereof, of which the respondents were ignorant and which could not have been discovered by them by the exercise of reasonable care, diligence and prudence. The answer further denies that the libellant was seriously injured by such accident and alleges that he continued to perform ordinary work on the ship up to the time he was discharged. The answer also alleges that if the libellant is suffering from synovitis, it is not in consequence of such fall.

The evidence on both sides shows that it was the custom of the ship to send a man aloft once a week to oil the sheaves and other places where two pieces of iron came together, and to inspect the tackle and report to the officers the condition thereof, while at sea. Upon arriving at the port of Sydney, the ship remained in port for three weeks and then was towed to Newcastle and remained there for a period of one week, or more. Nicholson, the mate of the ship, says they were at Sydney about three weeks and at Newcastle about one week. The witness Keranen says he shipped on the vessel at Newcastle and he was aboard of her before she went to sea about two weeks. The libellant testified that she was at Sydney a little over three

weeks and at Newcastle a little over one week. It is, therefore, certain that the ship was in these two ports in the aggregate at least a month and possibly five weeks. Jackson's evidence is that during such stay in port, after the sails were stowed, they were not inspected or overhauled at all by any one; that the day they went to sea from Newcastle, two men were sent up aloft in the main mizzen rigging to grease down, but the tow boat coming up they did not finish their work. The testimony as to the inspection of the rigging of the ship, while at sea, is such, while not being fully satisfactory or definite as to any adequate inspection or overhauling of the rigging, that, standing by itself would support, by weight of evidence, the contention that reasonable care had been used by the ship for the inspection of the rigging and its maintenance in good repair, but Jackson's testimony in regard to the neglect of the rigging during the period the vessel was in Sydney and Newcastle harbors is not attempted to be rebutted by any testimony introduced on the part of the respondents.

The law applying to this condition of things appears to be that although the fact of an injury to an employe resulting from a defect in appliances of the business in which he is employed, is not a presumption of negligence on the master's part, yet where there is evidence of negligence in relation to the accident resulting in the injury, then the burden of proof is on the employer to show that the injury was not the result of negligence. In other words, in such a case, the duty of explanation is cast upon the master. *Wood, Master and Servant,* Sec. 368; *Peirce v. Kile,* 80 Fed. Rep., 865, 867.

It appears to me that the failure of the respondents to meet the libellant's testimony as to their neglect of overhauling and inspecting the rigging, while lying in port for four or five weeks, during which time the weather was rainy and stormy, as testified to by libellant and not rebutted, is evidence of negligence on their part sufficient to place upon them the burden of disproving that such negligence did not contribute to the accident.

Two pieces of rope were offered in evidence, supposedly by

the respondents, though the record does not show by whom they were introduced. These ropes were identified by the witness Nicholson, who was the mate of the vessel. The following examination took place: "Q. How old was this foretop-"gallant sheet that broke? A. About six months. Q. You "have examined the rope, have you? A. Yes sir. Q. Is "that the rope (pointing to rope marked Exhibit 1) ? A. Yes "sir. Q. There is a smaller piece of rope here, what is "that? A. This rope was spliced on after that rope was "parted. That rope was taken down and this put on." Also, in the examination of Mr. Palmgren, master of the ship: "Q. "Where is the foretop-gallant sheet that parted? A. On that "table,—part of it. Q. Where did it part? A. I cannot "say exactly. Q. Has any part of the rope been taken off? "A. The part on the block is gone. If anything carries away "aboard the ship we trim the ends, cut off the fag end and use "it for some other purpose. Q. That was what you did with "that rope? A. Yes sir. Q. What is this small piece of "rope,—this stranded piece? A. I do not use the gallant sheet "more than a year. There is more wear and tear from the "clew of the sail to the quarter block and the reason this was "done this was beginning to chafe, the rope was taken off and "the new piece put in, but this the mate considered strong "enough to hold it on the quarter block and we have to put a "pieced line to prevent the chafing and this is placed to the "chain." It is evident from these examinations that the clerk in labeling these two exhibits, mistakenly marked the old rope which was a part of the sheet that was carried away, exhabit two instead of exhibit one, and the small stranded piece, exhibit one instead of exhibit two. This mistake creates no confusion in my mind as to the identity of these two pieces, they being fully described by both of these witnesses so clearly that there is no doubt as to which is which. The large piece, which is a part of the foretop-gallant sheet, has been described in different ways by different witnesses, Jackson speaking of it as being old and rotten. Witnesses for the ship describe it

as being in good condition and suitable for the purpose for which it was intended, being a good Manila rope originally, having been in use about eight months. The master testified that such a rope was usually discarded by him after about twelve months use. I regret that there was no expert testimony given as to the present condition of this rope based upon a careful examination. The rope is apparently old, being dark in color and having the appearance of considerable wear; in places it has the appearance of being seriously chafed. Upon unraveling this rope and exposing a single strand, or yarn, I find that many of the fibers of each strand, except a strand selected from the interior which has apparently had no exposure, are broken at intervals of every two or three inches,— broken or frayed, so that they have come apart and the ends of such broken fibers are dark in color. This examination shows that a considerable proportion of the majority of the strands are useless, for some of these strands being now not more than three inches in length, the tensile strength of the rope is reduced very considerably, how much, I am not able to say. This condition is, to my mind, clear evidence of a considerable deterioration in the strength of the rope and it is a condition which could have been easily ascertained by any one making a careful examination and untwisting the rope and closely examining the strands. It is a condition which would obviously happen by chafing and might be increased by the rope remaining in a damp condition for a long period. I feel that this state of the rope, together with the evidence of Jackson as to the neglect of the ship to overhaul the ropes during the stay in Sydney and Newcastle harbors, together with the breakage of the rope, places upon the ship the duty of accounting for the breakage of the rope by latent defect or by some cause beyond the control of the vessel using ordinary care and diligence in the preservation of the tackle.

"If the master 'knows, or, in the exercise of due care, might have known,' that  *  *  *  his structures or engines were insufficient, either at the time of procuring them or at any

subsequent time, he fails in his duty." *Wharton's Law of Negligence,* Sec. 212.

"By ordinary care is meant such as a prudent man would use under the same circumstances; it must be measured by the character and risks of such business; and where such persons whose duty it is to repair the appliances of the business, know or ought to know by the exercise of reasonable care, of the defects in the machinery, the company is responsible for their neglect." *Texas & Pacific Railway Company v. Barrett,* 166 U. S. 617, 619.

The plaintiff must "prove that the defendant has violated some contract, or rule of law, thus infringing upon the plaintiff's known rights; or else he must prove facts and circumstances from which it can be ascertained with reasonable certainty what particular precaution the defendant ought to have taken but did not take. He must also prove facts from which it can fairly be inferred that the defendant's negligence was the *cause,* and the *proximate cause,* of the injury." *Vol. 1, Shearman & Redfield on the Law of Negligence,* (4th Ed.) Sec. 57.

"So, with regard to defective materials, etc., it is enough to prove that the materials were defective in such respect that, if a proper inspection had been maintained, the defects would probably have been ascertained in time to have prevented the injury complained of." *Id.* Sec. 223.

Taking the evidence in regard to the weekly inspections in the light of the present condition of the rope in question, and from the nature of such testimony, which was vague and indefinite containing no statement of any direct examination of this piece of rope or of any part of the rigging, the impression is made upon my mind that the so-called inspections and over-haulings were casual and perfunctory and that no thorough investigations of the state of the rope, by direct examination and untwisting of the strands, was made at all. The case of *The Columbia,* 124 Fed. Rep. 745-6, is similar, in some features, to the one at bar. The court said:

"The evidence shows that, upon a general inspection, the line looked fairly well on the outside, but was in bad condition on the inside. It had been in use for a year, and had been used two or three times a week."

It is unfortunate that the pieces of rope where the break occurred were not produced in court, as their condition would have been very significant in regard to the responsibility of the ship. It was in the power of no one but the master to have furnished this evidence. To some extent he is excusable in that the injury to libellant did not at first appear to be serious. It is certainly important and desirable that in case of similar accidents, the master should see to it that the rope or appliance involved should be put aside in order that it may be produced in case litigation is begun.

I find that the respondent is responsible for the breaking of the rope by which the accident occurred to libellant.

Counsel for respondent argued that there was no evidence that the diseased state of libellant's hand was caused by the accident and that the evidence showed that the libellant was in a delicate state of health at the time he shipped on board the vessel, having had an attack of malarial fever which had previously compelled him, on several occasions, to remain at different hospitals for treatment, and that the trouble with his hands may have arisen from such malarial condition. The authorities are nearly unanimous in the view that a predisposition to disease, or the existence of latent disease in the system of a person who receives an injury which causes such disease to break out, does not deprive him of his right to damages from the fact of such predisposition or the existence of latent disease in his system.

"A predisposition to disease may, it has been said, be an intervening cause, but it is one which is set in motion by the defendant's wrongful act." *Watson's Damages for Personal Injuries*, Sec. 219.

In the case of *McNamara v. Village of Clintonville*, 62 Wisc. 207, 213-14, the plaintiff fell and injured his knee in conse-

quence of a defect in the village sidewalk; the disability from the injury was prolonged in consequence of a predisposition in the plaintiff to inflammatory rheumatism, which predisposition did not, in any way, contribute to the fall resulting in the injury complained of. The court said:

"The predisposition to inflammatory rheumatism was an intervening cause but was set in motion by the tortious act complained of. * * * The mere fact that he was more susceptible to serious results from the injury by reason of the presence of disease did not prevent him from recovering the damages he had actually sustained."

Although the disease of synovitis is not a necessary result of such injury as libellant received, yet, according to the evidence of the medical expert witnesses, it could be caused, and often is, by an injury like a blow or strain in the region of the joint. The medical experts disagree as to the possibility of the disease being caused by certain ailments such as infectious diseases, malaria, rheumatism, etc. As the disease developed in the part injured shortly after the injury was received, it is a reasonable inference that it was induced by it and that therefore the negligence of the owners was the direct cause of this disease, which frequently develops from injuries to the person. *Dickson, et al. v. Hollister,* 123 Pa. St. 421, 430-1. If personal injuries are the direct cause of a diseased condition which develops into chronic synovitis, they may properly be regarded as the proximate cause thereof. *Watson, Damages for Personal Injuries,* Sec. 214; *Bishop v. St. Paul City Railway Co.,* 50 N. W. 927, 928-9.

In the case of *Pullman Palace Car Co. v. Barker,* 4 Colo. 344, it was held that the illness of the appellee which resulted from exposure made necessary by the car on which she was travelling taking fire, was traceable to her physical condition at the time and was not the subject-matter of damages, but was a remote and not a natural or proximate result of the appellant's negligence. This case stands alone among American decisions,

there being no case, that I have been able to find, that supports it in any way.

In accordance, therefore, with the prevailing American authorities, I find that the diseased condition of the libellant's hand was due to the injury which he received as shown by the evidence, which injury was the proximate cause thereof.

The question of damages in this case is a difficult one, from the fact that there is little evidence to definitely show how the libellant is affected in his employment as a sailor. His own testimony, which is the only testimony on this point, is that he is, in consequence of the condition of his hand, not able to accept employment in a square-rigged ship but that he might find employment in fore and aft vessels or steam vessels, and that he cannot work as well as before because he can only hold a rope with one hand. There is no evidence as to his age; it is therefore impossible to say exactly what damages would make up to him for his injuries. From the evidence of the medical experts, he is never likely to recover the full use of the diseased finger.

Damages to the amount of five thousand dollars were asked for. Under all the circumstances of the case I feel that a judgment of one thousand dollars is reasonable, and will sign a decree to that amount with costs.