## Wm. W. Bishop vs. St. Paul City Ry. Co.

Argued Nov. 24, 1891. Decided Jan. 14, 1892.

**Negligence.**—Evidence *held* to justify a finding of negligence in respect to the condition or operation of a train of passenger street cars (a cable line propelled by steam) which, while carrying passengers, ran down a steep declivity, composing a part of the line, at very great and dangerous speed, and apparently beyond the control of those operating the train.

**Injury Causing Paralysis.**—Evidence *held* to justify a finding that injuries received by the plaintiff, manifested immediately by temporary unconsciousness, by headache, nervousness, sleeplessness, and some impairment of mental faculties, was also the cause of his paralysis, although that did not supervene until seven months after the injury.

**Verdict—Form—Inference from.**—From the mere fact that, by their verdict, the jury assessed the plaintiff's damages at a specified sum, "plus" another specified sum, which latter amount was the same as that demanded in the complaint for *special* damages, it is not to be conclusively inferred that this was awarded by the jury as special damages.

**Exception to Charge not Specific.**—The court having assumed to incorporate in its charge to the jury several requested instructions, and having announced to counsel that such requested instructions had been given, an exception to "any qualification" of the requested instructions is not sufficient to call attention to the fact that a qualifying word had been added in giving one of such requests.

**Proximate Cause.**—If an injury is the direct cause of a diseased condition which results in paralysis, the latter may be ascribed to the injury as a proximate cause.

**Newly-Discovered Evidence.**—Application for new trial on alleged newly-discovered evidence held properly denied.

Verdict sustained as to amount.

Appeal by defendant from an order of the district court of Ramsey county, *Kelly*, J., made June 30, 1891, refusing a new trial.

Action to recover for injuries received by plaintiff, January 27, 1888, while a passenger upon defendant's Selby avenue cable line. The trailer in which he rode was going east, and was overturned near

the foot of the hill on the curve into Third street. Plaintiff was standing at the time, holding himself steady by a hand strap. He was thrown down and injured about his head, but soon went about his business. On September 5, 1888, paralysis supervened, involving the whole left side. The action was tried January 28, 1891, before a struck jury. Near the close of the charge to the jury, the judge, at the verbal request of plaintiff's counsel, said to the jury: "If in the accident the plaintiff received injuries which resulted in the disease that ultimately resulted in paralysis, then the accident is the proximate cause of the paralysis. All the physicians have said that the direct cause of plaintiff's present condition, and of his condition when he brought this suit, was the bursting of a blood vessel in the brain. Now, if you believe from the evidence that the accident set in motion certain things which caused or brought about this bursting of the blood vessel, then the accident is the direct or proximate cause of the injury." To this defendant excepted. Defendant requested the judge to direct the jury to return a verdict for the defendant. This being refused, he excepted.

In his general charge to the jury the judge had said:

"Unless the jury are satisfied, by a fair preponderance of the evidence in this case, that the paralysis which befell the plaintiff about the 5th of September, 1888, was the proximate (that is, the natural and ordinary) result of the injuries he received in the street car disaster occurring January 27, 1888, then you must find for the defendant; and this is so, even though it has not been made to appear what in point of fact caused plaintiff's distressed condition; because the burden is on the plaintiff to prove, not that his paralysis might have resulted from the injuries he received in that accident, but the plaintiff must prove to your satisfaction that as a matter of fact, and not as a mere conjecture, the accident did set in motion the causes which at last resulted in his paralysis. Nor is it incumbent on the defendant to show that the plaintiff's paralysis might have resulted from other causes, or to prove that it did not result from the accident."

Verdict for plaintiff for $13,500, plus $1,500; total, $15,000.

Defendant moved for a new trial, on the ground of newly-discovered evidence, and for errors in law occurring at the trial, and be-

cause the verdict was not justified by the evidence, and was contrary to law, and the damages excessive. The motion was denied, and defendant appealed.

*Henry J. Horn*, for appellant.

It is obvious that there was no apparent connection between this stroke of paralysis and the accident, and that proof of the accident, and the slight injuries that he apparently received at the time, together with the proof of the paralysis, would not make a *prima facie* case. It was therefore incumbent upon the plaintiff to show that this paralysis was the result of or due to the accident. All the expert evidence shows that the apparent bodily injuries he received at the time, and which he and his family describe, were insufficient to account for the paralysis; also that, in case the rupture of cerebral blood vessels was caused by a wound or injury thereto at the time of the accident, the paralysis would have supervened within a few hours, if not immediately. The connection, therefore, between the accident, if any, and the paralysis, was occult and indeterminable by any investigation based upon observation, or upon any clear and safe rules, by which results are arrived at.

Paralysis, as it developed in this case, was believed by the medical experts to be the direct result of the rupture of one or more of the large arteries in the brain, or what are termed the "cerebral arteries," and the physicians seem to unite in the theory that a rupture of this kind, where there was no lesion or wound of the cerebral arteries, could only take place in case the walls of the arteries involved were weakened or degenerated by disease, so as to be incapable of sustaining the pressure of the blood within. That where an artery is in a healthy condition the pressure of blood, although in excess of what is usual or ordinary, is insufficient to cause such rupture; so that it was necessary in the first instance, to sustain plaintiff's theory, to prove that the cerebral arteries, which were supposed to be involved, were in a diseased condition at the time of the paralysis.

It appeared by the testimony of the experts, taking it together, that the walls of such arteries may become diseased, and be rendered by such disease so weakened as to result in rupture, from a great

many causes, the most common of which are deposits carried to and within these arteries from other parts of the system, especially after the age of 40, such as calcareous deposits, atheromatous deposits, (pasty, as the name denotes,) swellings within the arteries, fibrinous matter, clots of blood sometimes, and in other ways these arteries become obstructed, their elasticity impaired and diminished, weakened, and their power of resistance to the blood pressure within greatly diminished.

These cases very frequently and generally are not discernible by any diagnosis relied on by physicians, or by any premonition to the patient prior to the catastrophe.    These facts were testified to and admitted by the experts, so that, supposing that the physicians were not mistaken in deciding that, at the time of the paralysis, one or more of the principal cerebral arteries must have been in such a diseased condition as to account for the rupture, there was no reliable evidence that this diseased condition proceeded from one cause more than another.

In order to reach another indispensable fact in the theory of the plaintiff in this connection, it was necessary to show, not only that the arteries involved were in a diseased condition, but that the accident had produced this disease.    The difficulty here arose which was not surmounted and could not be surmounted,—what was the character of the disease?    This could only be guessed at.    It might have arisen from any one of the causes before mentioned just as well, and much more probably, than from an accident which seemed trifling in its character, and had transpired seven months before.

Opinions founded upon assumed facts are unreliable, and not admissible as evidence.    It is indispensable that the groundwork or foundation upon which the opinion is based should be proved by competent evidence.    *People* v. *Millard,* 53 Mich. 63; *Head* v. *Hargrave,* 105 U. S. 45; *Anthony* v. *Stinson,* 4 Kan. 212, 222.

The court modified the defendant's seventh request by inserting the word "much" before the word "weight" so as to read, "The mere possibility that such symptoms were connected with the paralysis or caused by the accident is not entitled to much weight," giving the jury to understand that a mere possibility was evidence upon this

point, though of not *much* weight. Of how much weight it might be, was a question left to the jury, and not explained or defined by the court.

Consequences which are contingent, speculative, or merely possible are not proper to be considered in estimating damages, and may not be proved. *Strohm* v. *New York, L. E. & W. R. Co.*, 96 N. Y. 305, 306.

The mere possibility that the paralysis was due to the injury embraced the double proposition that it might or might not be so, but not the single proposition that the paralysis was probably due to the accident. *Miley* v. *Broadway & S. Ave. R. Co.*, 8 N. Y. Supp. 456; *Elsas* v. *Second Ave. R. Co.*, 9 N. Y. Supp. 210.

*Munn, Boyesen & Thygeson*, for respondent.

The evidence shows, beyond controversy, that the respondent had what is known as "cerebral *hyperæmia*," commonly called "congestion," and that the same was caused by the injury and shock received in this accident. The expert witnesses testified that, unless the party recovers from this, it would, within six to nine months, result in either paralysis, insanity, or softening of the brain. The jury are the judges of the questions of fact in this case, and their decision of the matter is practically final.

The bursting of a blood cell is the cause of respondent's paralysis, which is known as "*hemiplegia*." These blood cells do not burst or rupture without some cause, and the testimony in this case shows that there are two causes—*First*, a pre-existing diseased condition of the blood cells caused by a diseased condition of either the kidneys or urine, or from old age; *second*, a physical injury which either causes an immediate rupture, or, if not an immediate rupture, the injury so impairs the blood cells that they continue to grow weak and ultimately rupture. The injuries and shock received by Mr. Bishop in this accident so injured the blood cells of his brain that some of them burst, causing the paralysis.

The plaintiff's witnesses, specialists in diseases of this character, testified that both the nervous shock and the physical injury received by Mr. Bishop in this accident brought on this cerebral *hyperæmia*, or impaired condition of the blood cells of the brain, impairing them to

such an extent that one or more burst, bringing on this paralysis; and that the injuries received in this accident were the cause of this paralysis.

All the facts, together with the opinions of the various experts, were laid before the jury; they have passed upon them and found in favor of the respondent; and it seems unnecessary to enter into further discussion of those questions before this court.

Counsel for appellant took no sufficient exception to any alleged modification of his seventh request.

DICKINSON, J. 1. Attention will first be directed to the point as to whether the evidence justified the conclusion of the jury that the defendant was chargeable with negligence in respect to the conditions which resulted in the accident complained of. This occurred on the 27th day of January, 1888, on the defendant's cable line of street railway, which had been put in operation for the carrying of passengers only two days before. The motive power by which cars were propelled was a stationary steam engine at the "power house," as it is called, at the western terminus of the line. An endless wire cable, passing around drums or wheels at the power house, ran in a trench beneath the track to the eastern extremity of the line, and thence back to the power house. The engine was intended to propel this cable (by means of the revolution of the drums or wheels around which it was wound) at a uniform rate of about eight miles an hour. The engine was provided with a "governor," the automatic action of which was intended to preserve that rate of speed without variation. Two cars composed a train, the forward car, called the "*grip* car," open on all sides, but provided with seats for passengers, and behind it a closed passenger car, which may be distinguished as the "coach." The power for the propulsion of each train was applied by means of a clutch, or "*grip*," as it is generally called, running in the trench, where it is made to grasp or clutch the moving cable, when it is desired to propel the train, or (going down hill) to restrain the speed of the cars, so that it shall not exceed that of the cable. To stop the cars, on level ground, the grip is released from the cable, and brakes applied to the cars. The grip is connected with the grip car through a slot in the trench above the cable, and is operated in the grip car

by a lever by means of which, at will, the grip may be made to grasp or to release its hold on the cable. The grip proper consists of two "dies," as they are called by the witnesses, one just above and the other just below the cable. By means of the grip lever, these dies are pressed against the cable, so as to hold it firmly in their grasp, or are separated so that the cable runs freely between them. A few blocks east of the power house the track, going east, descends a steep hill, at a grade of 16 feet in a hundred feet for a distance of four or five hundred feet, and at the foot of the steep declivity there is a sharp curve, the *radius* of which is variously given as 133 and 150 feet. The descent of this hill should be made at a speed not greater than that of the cable, which should be held fast by the grip, the brakes being also applied to aid in thus restraining the speed. On the occasion in question the train in which the plaintiff was a passenger ran down this hill at an extraordinary rate of speed, different witnesses estimating the speed at from 25 to 60 miles an hour. When the curve was reached the coach was thrown over on its side, and dragged a considerable distance in that position. There was some conflict in the evidence, as might be expected, as to some of the circumstances, while there was no controversy as to the general fact as above stated. There was evidence going to show that, even before the steep hill was reached, and on the more gradual slope by which it is approached, the cars commenced going at an unusual and increasing rate of speed; and there was abundant evidence that, as they passed over the brow of the steep hill, they started down with very great, and apparently unrestrained, velocity, which increased until the curve was reached, and that the efforts of those in charge of the grip car to check the speed were without any apparent effect. Some witnesses say that the train was partly down the hill before control of the speed of the train seemed to be lost. It appears, also, that on the previous trip made by this grip car a new *die* had been put in, which had worked loose during that trip, and that before the train left the power house on the trip in question this was known, and an attempt was made to make it secure, as was necessary to be done in order that the grip might grasp the cable firmly. There was some evidence, too, of difficulty experienced after leaving

the power house, and before coming to the hill, in making the grip take hold of the cable after stopping.

From the evidence bearing upon this point, of which we have given but a sketch, it seems apparent that the verdict of the jury cannot be disturbed for want of proof of negligence. The necessity for great care in respect to the condition and management of the apparatus depended upon to control the speed of trains down so steep a declivity was most obvious. There was a defect, known before the train left the power house, and an attempt to repair it, which the jury might find to have been negligently done. Inability to control the speed of the train on the hill is undisputed, and this makes *prima facie* a case of negligence, even though the jury were unable to determine the precise nature or location of the defect. The theory advanced on the part of the defendant is that the accident is to be attributed to a secret defect in the *governor* of the engine, resulting in a temporary acceleration in the motion of the engine and of the cable. But this theory cannot be maintained, certainly not as against the verdict of the jury. There was no evidence that the motion of the engine or cable was in fact increased, unless that could be inferred from the nature of the accident. It does not appear that any of the other cars running at the same time, and propelled by the same cable, were carried along at unusual speed.

2. The case presents the question as to whether the plaintiff's grave infirmities, which became manifest some time after the accident, were a result of the accident. The plaintiff was standing in the rear car or coach, supporting himself by holding on straps suspending from the upper part of the car for that purpose. When the car was thrown on its side, as it reached the curve in its rapid descent, he was thrown down, the impulse being such as to break his hold on the supporting straps. He immediately became unconscious, but regained consciousness in a few moments, and did not then seem to have been very seriously injured. On the right side of his head, above the ear, were a few cuts, apparently not very harmful, and a small contusion, the marks of which disappeared within a few days. He went about his business the same day, and continued to do so thereafter for a considerable period of time. But while, according to the proof, he

v.48m.—3

had always before the accident been in good health, and had never suffered the ills or exhibited the symptoms which followed it, the evidence goes to show that, from that time on, a marked change became manifest in his physical and mental condition.   He became nervous and irritable; was troubled with inability to sleep; suffered a dull, heavy pain in the back of the head, extending sometimes further down the back.   There was a feeling of pressure within the head, as though it would burst.   When sleeping, the scene of the accident was repeatedly pictured to his mind in dreams.   His mental functions were affected, his mind being "muddled," as he expresses it.   These conditions did not pass away, but became more aggravated, and on the 5th of September, some seven months after the accident, without other apparent cause than the circumstances here referred to, paralysis supervened, involving the whole left side.   The paralytic condition still continues, and, according to the opinions of competent expert witnesses, will always exist.   The plaintiff was 50 years of age.   While upon this appeal the facts must, without doubt, be taken to be as above indicated, the question was closely contested as to whether the paralysis, caused immediately by the rupture of a blood vessel in the brain, is the result of the accident and the shock and injury then received.   A careful examination of the voluminous evidence bearing upon this point shows that the verdict in favor of the plaintiff is certainly justified.   The proof was chiefly the testimony of numerous competent medical experts.   The examination of these witnesses on both sides was conducted with marked intelligence, skill, and thoroughness; and while these witnesses, whose competency to testify on the subject is beyond question, do not agree in their opinions, it seems apparent that the jury were as well informed as they could be, from the nature of the case, to form a correct conclusion.   It is needless to here enter into any extended statement of the pathology of the case, as given by these witnesses, or to contrast the views and reasons given for their opinions.   There is little or no controversy over the fact that the rupture of the blood vessel causing the paralysis is to be ascribed to a degeneration or impaired condition of the blood vessel, the process of which degeneration might have extended over a considerable period of time before the occurrence of the rup-

ture.  But whether such degeneration or impairment of health of the blood vessels was or could have been caused by the accident and injury then received the experts disagree.  Upon this point we will only say that the opinion of several competent witnesses is that it was so caused, and it may be added that one of the explanations given for such an opinion is that the physical concussion (which produced temporary unconsciousness) and the mental shock affected and impaired the nutrition of the nerve cells of the brain which preside over and control the circulation of blood in that organ, so that the blood vessels became distended from an excessive flow of blood, and gradually degenerated, and became weakened, until they were incapable of resisting the pressure.  In support of the opinions of experts in favor of the plaintiff's side of this issue are to be considered also the facts, which the evidence tended to show, of the health of the plaintiff up to the time of the accident; that the ills which he suffered from that time on indicated an excess or unnatural pressure of blood in the brain; and that an examination of the plaintiff disclosed no disease or functional derangement of other organs to which the paralysis might be attributed.

3. In his complaint the plaintiff alleged special damages to the extent of $1,500.  In the verdict the jury assessed "his damages at the sum of thirteen thousand five hundred dollars, plus fifteen hundred dollars; total, fifteen thousand dollars."  This total was less than the damages demanded.  It is assumed by the appellant that the $1,500 was assessed as special damages, and it is claimed that, as such, it was not justified by the evidence.  We shall not refer to the evidence on this point, for we cannot assume that the $1,500 specified in the verdict was for special damages.  The record does not show that it was, and the most that can be said is that it *may have been* so intended.  That is not a necessary inference from the form of the verdict.

4. The court incorporated in its general charge certain instructions requested by the defendant.  One of these instructions, after referring to the symptoms following the accident, and prior to the paralysis, was as follows:  "The mere possibility that such symptoms were connected with the paralysis, or caused by the accident, is not

entitled to weight:" In giving this request the court used the word "much" before the last word "weight." The court stated to counsel for defendant that he had given all the instructions requested, excepting one, which was specifically referred to. The defendant then excepted to the refusal of the court to give the specified instruction, and " to any qualification of the other requests." This exception was too general, under the circumstances, to call the attention of the court to the particular qualification resulting from the use of the word " much," which may have been inadvertent, as seemed probable from the statement of the court that he had given these instructions to the jury. The attention of counsel being thus called to the fact that the court assumed to have given the instruction as requested, the exception should have been sufficiently specific to direct the mind of the court to the fact of the change in language of the requested instruction as given.

5. The instruction referred to in the ninth assignment of error was not, as applied to the case before the jury, erroneous. The injury received at the time of the accident was the proximate cause of the paralysis, if it caused the disease in the course of which and as a result of which the paralysis followed.

6. In the refusal of the court to grant a new trial on the ground of newly-discovered evidence we see no error. The opposing affidavits of physicians who examined the plaintiff are strongly opposed to the claim that his physical condition is better, or the extent of the paralysis is less, than was shown or testified to at the trial.

7. In view of the incurable paralytic condition of the plaintiff, it cannot be said that the damages are excessive. To the remaining points made we do not deem it necessary to refer specifically, and will only say that they are not well taken.

Order affirmed.

(Opinion published 50 N. W. Rep. 927.)