PINE STREET TRADING CORPORATION, ETC. *v.*
FARRELL LINES, INC. ET AL.

\* \* \*

FARRELL LINES, INC. *v.* CHESAPEAKE OPERATING
COMPANY

[No. 119, September Term, 1975.]

*Decided October 14, 1976.*

364

The cause was argued before MURPHY, C. J., and SING-LEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*John H. Skeen, Jr.*, and *David W. Skeen*, with whom were *Skeen & Roach* on the brief, for Pine Street Trading Corp., appellant. *George W. Sullivan*, with whom were *William J. Little, James W. Himes* and *Little, Hall & Steinmann, P.A.*, on the brief, for Farrell Lines, Inc., appellant-appellee.

*David R. Owen*, with whom were *James W. Bartlett, III* and *Semmes, Bowen & Semmes* on the brief, for Chesapeake Operating Company, appellee. *Robert V. Barton, Jr.*, with whom were *Manfred W. Leckszas* and *Ober, Grimes & Shriver* on the brief, for Irish Shipping, Ltd., appellee.

ELDRIDGE, J., delivered the opinion of the Court.

This case, arising from damages allegedly sustained to the plaintiff's cargo of sugar, involves claims under both federal maritime law and state law.

In October 1969, Pine Street Trading Corporation contracted to purchase a large quantity of beet sugar located in Ireland from the Irish Sugar Company. The Irish Sugar Company arranged with Irish Shipping, Ltd., to transport the sugar to the port of Baltimore pursuant to the terms of Irish Shipping's short form bill of lading, which incorporated by reference the carrier's long form bill of lading and the provisions of the Merchant Shipping Act of Ireland (No. 40 of 1947). The bill of lading was endorsed over to Pine Street as consignee. Upon the cargo's arrival in Baltimore, the sugar was to be unloaded and "stacked man high on pier" by Chesapeake Operating Company, with whom Irish Shipping had a stevedoring agreement. Pine Street also entered into an agreement with Chesapeake whereby Chesapeake would store all sugar not removed from the marine terminal during the 5 day "free time" period — the time allowed for removing cargo from the pier

before assessment of demurrage charges. By so doing, Pine Street could store its cargo at Chesapeake's pier shed at a rate charged for warehousing, which would be considerably less than that charged for demurrage. Chesapeake also agreed to deliver quantities of sugar to various purchasers according to Pine Street's directions.

During late March 1970, the *Irish Poplar*, a vessel operated by Irish Shipping, arrived in Baltimore and discharged 17,476 one hundred pound bags of the sugar onto the pier "apron" — the outer portion of the pier. On May 13, 1970, an additional 10,089 one hundred pound bags of sugar were unloaded from the *Irish Spruce*, another Irish Shipping vessel, and also stacked on the pier. Subsequent to discharge of the cargo from both ships, Chesapeake removed the cargo to a shed occupying the center position of the pier. The bags in which the sugar was transported were constructed of two tar laminated outer layers of paper, and three inner layers of paper.

On May 7, 1970, subsequent to the arrival of the *Irish Poplar* but prior to the arrival of the *Irish Spruce*, a vessel owned by Farrell Lines, Inc., the *African Dawn*, arrived at Chesapeake's pier. Chesapeake discharged from the *African Dawn* roughly 500 tons of antimony ore which were contained in bags. During the evening of May 7, 1970, after the discharge of the cargo from the *African Dawn* was completed, the vessel left the pier.

On May 18, 1970, Mallory W. Lawrence, an inspector for the United States Food and Drug Administration (FDA), visited the Chesapeake pier and found antimony dust on the bags of sugar stored inside the pier shed. Subsequently, a condemnation action was brought by the United States against the bags of sugar remaining on the pier which had been discharged from the *Irish Poplar*, and also against the sugar received by purchasers of the *Irish Poplar* shipments, as well as the finished products manufactured by those purchasers using the sugar. The sugar which was discharged from the *Irish Spruce* was also detained, but since it was still on "import status," no condemnation action was necessary. In the condemnation proceedings, the

government alleged that the sugar was "adulterated" because it contained "an added poisonous and deleterious substance, namely, antimony dust, which may render" the sugar "injurious to health," and that it was held under insanitary conditions, in violation of 21 U.S.C. 342(a)(1) and (4). Pine Street did not contest the condemnation actions; rather, it signed consent decrees of condemnation.

Subsequently, Pine Street brought this action in the Baltimore City Court alleging (1) that Chesapeake was negligent in permitting the sugar bags to be contaminated with antimony ore; (2) that Irish Shipping breached its contract of carriage (the bill of lading) with respect to the shipment of the sugar cargo aboard the *Irish Spruce* which was discharged while the antimony was still on the pier; and (3) that Farrell Lines was negligent in discharging its cargo of antimony ore which it knew or should have known would contaminate the sugar which was already on the pier. Cross claims were filed by Chesapeake against Farrell Lines, by Irish Shipping against Farrell Lines and Chesapeake, and by Farrell Lines against Chesapeake, all seeking indemnification for any judgments that may be awarded against the cross-claimants in favor of Pine Street, and seeking also recovery of attorney fees and court costs. The cross claims were submitted for determination by the court.

The trial court awarded summary judgment in favor of Irish Shipping against Pine Street; subsequently Irish Shipping dismissed its cross claim against Chesapeake. A jury trial then ensued on Pine Street's claims against Farrell Lines and Chesapeake. Chesapeake produced expert testimony to the effect that antimony ore is not, in fact, a poisonous substance. Chesapeake argued, therefore, that Pine Street, by failing to contest the condemnation proceedings, had failed to mitigate any damages that may have resulted from Chesapeake's negligence in permitting the antimony dust to come near the sugar cargo. Evidence was also produced tending to show that because of the construction and manner of storage of the bags of sugar, antimony dust could not have contaminated the vast

majority of the bags, and that any danger of contamination could have been obviated by vacuuming the bags.

At the close of the plaintiff's evidence, the trial court granted a directed verdict in favor of Farrell Lines against Pine Street. The jury thereafter returned a verdict for Pine Street against Chesapeake in the amount of $1.00. The remaining cross claims were denied by the trial court. Pine Street appealed to the Court of Special Appeals, contesting, on several grounds, the jury's award of $1.00 in damages in its favor, and contesting also the granting of summary judgment in favor of Irish Shipping, and the granting of the directed verdict against it in favor of Farrell. Farrell appealed the denial of its cross claim against Chesapeake in which it sought attorney's fees and expenses. Chesapeake has not appealed either from the jury's verdict of liability against it in favor of Pine Street, or from the trial court's denial of its cross claim against Farrell. We issued a writ of certiorari prior to a decision by the Court of Special Appeals.

I.

*Pine Street v. Chesapeake*

The claim of Pine Street against Chesapeake is based upon (1) Chesapeake's failure "to perform properly its duty as warehouseman to care for, store and protect" the sugar cargo which had arrived on board the vessel *Irish Poplar*, (2) Chesapeake's failure to properly "store, care for and protect" the sugar cargo which had arrived on board the vessel *Irish Spruce*, and (3) Chesapeake's negligence in permitting the cargo of antimony ore from the vessel *African Dawn* to contaminate the sugar cargo of the plaintiff.

Preliminarily, we note that Pine Street's claims against Chesapeake are controlled by state law rather than by federal maritime law. The only contractual relationship alleged between Pine Street and Chesapeake involved Chesapeake's agreement to store the sugar cargo as warehouseman. Such a contract "is nonmaritime in nature and does not fall within maritime jurisdiction." *Howmet Corporation v. Tokyo Shipping Co.*, 320 F. Supp. 975, 977 (D.

Del. 1971). *See Pillsbury Flour Mills Co. v. Interlake S.S. Co.*, 40 F. 2d 439 (2d Cir. 1930). Moreover, no maritime tort seems to have been alleged. The activities of Chesapeake which were alleged by Pine Street to constitute negligence all appear to have occurred on Chesapeake's pier. It is well settled that a pier is, for purposes of maritime jurisdiction, an extension of land. *See Victory Carriers, Inc. v. Law*, 404 U. S. 202, 206-207, 92 S. Ct. 418, 30 L.Ed.2d 383 (1971).

On this appeal, Pine Street raises several contentions relating "principally to whether the issue of plaintiff's duty to mitigate damages or avoid the consequences of defendant's negligence was improperly presented to the jury as a result of certain of the trial court's rulings on evidence and instructions." While we do not agree with all of the contentions raised by Pine Street, we do believe that the trial court committed reversible error in connection with its instructions to the jury on the issue of mitigation of damages.

Pine Street argues that the trial court erred in refusing to instruct the jury, as requested by Pine Street, that "in considering the reasonableness of plaintiff's decision not to contest the government's forfeiture proceedings by a full trial of the issues," the jury should consider that the FDA, in such proceedings, "is not required to establish that a product it seeks to condemn of certainty will affect the public health but only that it may affect it . . . ."

Under 21 U.S.C. 334, the government may condemn any article of food which is found to be adulterated. Section 342 of Title 21 provides that "A food shall be deemed to be adulterated

"a(1) If it bears or contains any poisonous or deleterious substance which · may render it injurious to health; . . .

\* \* \*

"(4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health."

In *United States v. Lexington Mill Co.*, 232 U. S. 399, 411, 34 S. Ct. 337, 58 L. Ed. 658 (1914), the Supreme Court held that under this section:

> "It is not required that the article of food containing added poisonous or other added deleterious ingredients must affect the public health, and it is not incumbent upon the Government in order to make out a case to establish that fact. The act has placed upon the Government the burden of establishing, in order to secure a verdict of condemnation under this statute, that the added poisonous or deleterious substances must be such as may render such article injurious to health. The word 'may' is here used in its ordinary and usual signification, there being nothing to show the intention of Congress to affix to it any other meaning. . . . In thus describing the offense Congress doubtless took into consideration that flour may be used in many ways, in bread, cake, gravy, broth, etc. It may be consumed, when prepared as a food, by the strong and the weak, the old and the young, the well and the sick; and it is intended that if any flour, because of any added poisonous or other deleterious ingredient, *may possibly injure the health* of any of these, it shall come within the ban of the statute. *If it cannot by any possibility,* when the facts are reasonably considered, *injure the health* of any consumer, such flour, though having a small addition of poisonous or deleterious ingredients, may not be condemned under the act. This is the plain meaning of the words and in our view needs no additional support . . . ." (Emphasis supplied.)

Thus, in order to secure condemnation of a food under 21 U.S.C. 342, the government must prove, by a preponderance of the evidence, that there is a "possibility" that the articles of food *may* be injurious to health. *United States v. International Exterminator Corp.*, 294 F. 2d 270 (5th Cir.

1961); *Golden Grain Macaroni Co. v. United States,* 209 F. 2d 166 (9th Cir. 1953); *United States v. 1,200 Cans, Pasteurized Whole Eggs, Etc.,* 339 F. Supp. 131, 141 (N.D. Ga. 1972).

We believe Pine Street was entitled to the benefit of an instruction pertaining to the standards employed in a condemnation proceeding. Certainly, Pine Street's actions in failing to contest the condemnation action, in order to minimize their losses, was a crucial aspect of the case. The jury was instructed that the plaintiff "is not required to take action which may be unwise or impractical; the test is whether the Plaintiff did what an ordinarily prudent person would have been expected to do under the same or similar circumstances." However, nowhere was the jury instructed with regard to the legal requirements faced by Pine Street in attempting to challenge the FDA's action. Such an instruction, we believe, was necessary in order for the jury properly to determine the issue of the reasonableness of Pine Street's decision not to contest the condemnation actions. We therefore believe that refusal of such an instruction was reversible error.

Several other contentions are raised by Pine Street with respect to the admissibility of certain evidence and the refusal of certain other requested instructions. Since this case will be remanded for a new trial, and the proceedings in the new trial may follow a different course than in the original, we find it unnecessary to decide all of these issues. However, in the interests of justice and judicial expediency, we shall comment upon several of these points which are likely to arise at the new trial.

Pine Street argues that the trial court erred in excluding several reports of the Food and Drug Administration which analyzed samples of food products which allegedly contained the adulterated sugar from Chesapeake's pier. Five such reports were offered by Pine Street through the testimony of Thomas Dols, a chemist who had analyzed the food samples for the Food and Drug Administration. The admission of the reports into evidence was objected to on the ground that no testimony was presented linking the sugar contained in the food samples to the allegedly contaminated sugar involved

in the case. The trial court sustained the objection to the admission of the reports, stating that there was no "evidence to show that the samples that this gentleman analyzed actually came from the same sugar that was in discussion." The court rejected notations on the documents themselves indicating that the samples contained the adulterated sugar from Chesapeake's pier, stating that such information was hearsay. Pine Street contends that the reports were admissible under the business records statute, Maryland Code (1974), § 10-101 of the Courts and Judicial Proceedings Article, not to show that the sugar was in fact contaminated, but to show "what was, in fact, done by the Government with respect to the sugar which rendered it unavailable to the plaintiff and plaintiff's customers, which resulted in the damage that was suffered." Chesapeake, on the other hand, claims that an insufficient foundation was laid for the admission of the reports.

A document, to be admissible under the statutory exception to the hearsay rule for business records, must be "made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event," and the "practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards." Sec. 10-101 (b) and (c) of the Courts and Judicial Proceedings Article. While a foundation must be laid for the introduction of evidence under this statute, the foundation need not always consist of testimonial evidence, and in some cases the court may properly conclude from the circumstances and the nature of the document involved that it was made in the regular course of business. *Tellez v. Canton Railroad Co.*, 212 Md. 423, 432, 129 A. 2d 809 (1957); *Morrow v. State*, 190 Md. 559, 562-563, 59 A. 2d 325 (1948); *Thomas v. Owens*, 28 Md. App. 442, 447-448, 346 A. 2d 662 (1975). In *Tellez v. Canton Railroad Co., supra*, the Court held admissible an ocean bill of lading under the business records statute despite the apparent lack of testimonial evidence to provide a foundation for such admission, and the Court stated that certain notations on the bill of lading were admissible to prove certain facts, pointing out that the opposing party was

still entitled to dispute the correctness of the notations. 212 Md. at 434.

In our view the proffered FDA reports were encompassed within the business records act. As stated by the Court in *Morrow v. State, supra,* 190 Md. at 562, "no elaborate foundation" is necessary to prove that such documents are made by the FDA in the regular course of business. That the reports are hearsay is of course no valid objection if they are admissible under the statute, as the statute creates an exception to the rule excluding hearsay evidence.

A further problem pointed out by Chesapeake, however, is that not all of the proffered reports contain notations that the sugar was in fact delivered from Chesapeake's pier, or that it was delivered from the pier subsequent to the arrival of the antimony. We believe that those reports without such notations, absent other proof linking the sugar involved in the reports to the contaminated sugar on the pier, were insufficiently relevant to the issues involved in this case. Consequently, it would appear that some of the FDA reports were admissible and some were properly excluded on relevancy grounds.

Pine Street also contests the exclusion at the trial of several copies of condemnation proceedings in which bags of "Irish Pure Granulated Beet Sugar" and products made from that sugar, all of which were seized at places other than Chesapeake's pier, were condemned. The trial court excluded the exhibits on the ground that no connection was shown between the allegedly contaminated sugar at issue and the sugar, or products derived from the sugar, involved in the condemnation proceedings. Pine Street contends that those exhibits were admissible to show the action taken by the FDA, and thus the reasonableness of Pine Street's mitigation efforts. It further argues that a sufficient relationship between the sugar at issue and the condemned products was shown by Chesapeake's admission that it delivered sugar to at least some of the customers from whom the sugar was seized.

In our view, an insufficient relationship was shown between the sugar and sugar products involved in the

condemnation proceedings described in the excluded exhibits
and the sugar allegedly contaminated by the antimony. As
Chesapeake points out, the only identification that Pine
Street offered was that the seizures were made at locations
to which part of the sugar cargo had been delivered from
Chesapeake's pier. As the trial court pointed out, however,
two of the proceedings involved sugar or sugar products
which were seized from purchasers to whom Chesapeake
had no record of delivery. With regard to three other
proceedings, seizures were made from companies that had
received sugar from Chesapeake's pier both before and after
the antimony had arrived at the pier. Absent a better
foundation linking the condemned goods to the sugar that
was allegedly contaminated after the arrival of the
antimony ore on Chesapeake's pier, we believe that the
copies of the condemnation proceedings were properly
excluded.

Pine Street further insists that the trial court erred in
failing to instruct the jury with respect to the condemnation
actions "that there is a strong legal presumption that actions
taken by public officers, in this instance the FDA, are
regular and proper and that there attaches to an
administrative act . . . a presumption of the existence of
facts justifying the action taken." In an action seeking
condemnation of food articles under 21 U.S.C. 334, 342, the
government has the burden of establishing that the article
may be injurious to health. *United States v. Lexington Mill
Co., supra,* 232 U. S. at 411; *United States v. 5 Cases, Etc.,*
179 F. 2d 519, 522 (2d Cir. 1950). Even assuming arguendo
the applicability of the requested instruction to the instant
case, *but see Applestein v. Baltimore,* 156 Md. 40, 48, 143 A.
666 (1928), the effect of such an instruction might have been
to confuse the jury and to suggest incorrectly that Pine
Street had the burden of proof in the condemnation action.
Therefore the instruction was properly denied. *See Hartman
v. Meadows,* 243 Md. 158, 163, 220 A. 2d 555 (1966); *Wintrobe
v. Hart,* 178 Md. 289, 13 A. 2d 365 (1940).

Pine Street also argues that the trial court erred in
instructing the jury that, in considering the reasonableness

of plaintiff's decision not to contest the government's condemnation proceedings, there was no evidence that the antimony dust was poisonous. Preliminarily, we note that Pine Street did not object either to the trial court's instruction that antimony ore is not poisonous, to the court's repetition of that instruction on at least one later occasion, or to the failure of the trial court to instruct that the sugar may have been condemned under 21 U.S.C. 342(a)(4) if it became contaminated with "filth." Therefore, it is barred from raising those issues on this appeal. Maryland Rule 554 e; *Federalsburg v. Allied Con.*, 275 Md. 151, 163-164, 338 A. 2d 275 (1975); *Gray-Will Constr. Co. v. Gunther*, 256 Md. 740, 741, 261 A. 2d 730 (1970); *Klavens v. Siegel*, 256 Md. 476, 478-480, 260 A. 2d 637 (1970); *Rockville Corp. v. Rogan,* 246 Md. 482, 484-485, 229 A. 2d 76 (1967). However, since there is to be a re-trial, we note that there seemed to be evidence that antimony, once soluble, may be toxic to human beings, and that it may become soluble if introduced into a food product, such as pickle juice, containing a certain concentration of acid.

Pine Street also urges that the trial court erred in denying its requested instruction that the Food and Drug Administration sought to condemn the sugar as a poisonous *or* deleterious substance. *See* 21 U.S.C. 342(a)(1). By failing to include the word "deleterious," Pine Street argues, the court failed to give the jury any frame of reference by which the jury could judge the reasonableness of its actions in not contesting the condemnation proceedings, including the applicable standard for contesting the FDA action. We agree. As previously noted, the reasonableness of Pine Street's actions when faced with the condemnation suits was a central aspect of the case. Clearly, the sugar could have been condemned upon a showing that it contained a deleterious substance. 21 U.S.C. 342(a)(1); *United States v. 1232 Cases American Beauty B. Oysters*, 43 F. Supp. 749 (W.D. Mo. 1942). There was evidence indicating that Pine Street could have reasonably believed that the sugar would have been detained by the FDA as a result of contamination of the sugar cargo by antimony even if antimony was not a

poisonous substance. Thus, the denial of the requested instruction was error.

Finally, Pine Street contends that the trial court was in error "in refusing to instruct the jury that if it found the defendant liable to the plaintiff it may, in its discretion, award interest on the sum at the rate of six percent per annum from May 20, 1970, until the date of the verdict." This instruction should have been given. In *Robert C. Herd & Company v. Krawhill Machinery Corp.*, 256 F. 2d 946, 952 (4th Cir. 1958), Chief Judge Sobeloff wrote for the court that "it is now almost universally recognized that interest is recoverable upon the value of chattels tortiously converted, destroyed, or damaged." In that case the court examined whether, under Maryland law, interest would be awarded a shipper for damages to his property resulting from a stevedore's negligence. The court, in an extensive review of the Maryland law on the subject, noted that Maryland was one of the early states to manifest the tendency in tort cases involving injury to chattels "to treat interest as part of the just compensation due an injured party." *Id.* at 952. While pre-judgment interest is not ordinarily allowed "for bodily harm, emotional distress, or similar intangible elements of damage insusceptible of precise measurement," damages for the loss of a chattel normally will include the "loss of the use of money thereby occasioned." *Ibid. Cf. Saunders v. Mullinix*, 195 Md. 235, 240, 72 A. 2d 720 (1950); *Merchants' Bank v. Williams*, 110 Md. 334, 72 A. 1114 (1909). *See also Taylor v. Wahby*, 271 Md. 101, 112-114, 314 A. 2d 100 (1974).

## II.
### *Pine Street v. Irish Shipping, Ltd.*

The claim of Pine Street against Irish Shipping is based upon an alleged breach of Irish Shipping's contract of carriage with Irish Sugar Co., Ltd., under which Irish Shipping agreed to transport on board the vessel *Irish Spruce* 10,089 one hundred pound bags of sugar from Dublin, Ireland, to Baltimore. The contract consisted of a short form bill of lading between Irish Shipping and Irish Sugar Co., Ltd., the shipper and consignee. It is conceded

that the bill of lading was effectively endorsed to Pine Street, thereby investing Pine Street with the contractual rights of the consignee.

The short form bill of lading incorporated by reference the provisions of Irish Shipping's long form bill of lading. The long form bill provides, in pertinent part:

> "The Carrier shall be under no liability whatsoever for loss or delay of, damage or expense to, goods howsoever caused, or wheresoever occurring when such loss or damage arises prior to the loading on, and/or, *subsequent to the discharge* from the Ocean vessel, notwithstanding any custom of the port to the contrary.
>
> * * *
>
> "The Carrier may commence discharge immediately upon arrival of the ship and continue day and night, Sundays and holidays included, any custom of the port notwithstanding. The goods shall be taken *from alongside the ship* by the Consignees or Receivers, who shall pay all dues, including tonnage and shed dues, and all landing charges on the goods, and the Carrier shall not be responsible for delivery to marks or numbers. If the Consignees or Receivers fail to take the goods from alongside as and when the same are discharged the Carrier, his servants or agents shall be at liberty, but shall not be bound to, land the same, or put them into craft or store in any place whatsoever at the risk and expense of the Owner of the goods and shall thereby fully discharge the Carrier's obligation hereunder to deliver the goods and the Carrier shall have a lien upon the same for all costs and expenses incurred thereby. The Carrier or his agents may, however, in the Carrier's option, effect the reception and porterage of the goods on delivery at his or their tariff Rates, and at the sole risk and expense of the Owners of the goods. Further, the

Consignees or Receivers shall indemnify the Carrier against all costs, expenses and liabilities whatsoever which may be incurred by the Carrier whether under compulsion or otherwise, in respect of the shifting, segregation, sorting, cleaning, piling, storage or disposal of the goods while in shed or on quay after discharge from the ship." (Emphasis supplied.)

Pine Street contends that Irish Shipping failed to make a proper delivery of the sugar cargo by discharging it at a pier which was contaminated by accumulations of antimony dust. It further argues that mere discharge of the sugar onto the pier apron — a narrow area constituting the perimeter of the pier — did not effect a delivery of the goods, and that Irish Shipping was responsible for the losses sustained by Pine Street prior to the expiration of "free time." Irish Shipping contends, on the other hand, that the Chesapeake Operating Company was the agent of Pine Street. Thus, it argues, a proper delivery was achieved by delivering the sugar to the custody of Chesapeake on the pier apron which was dust-free.

An action for breach of an ocean bill of lading is governed by federal maritime law. *Armour & Co. v. Ft. Morgan S.S. Co.*, 270 U. S. 253, 259, 46 S. Ct. 212, 70 L. Ed. 571 (1926); *Ex parte Easton*, 95 U. S. 68, 72, 24 L. Ed. 373 (1877); *David Crystal, Inc. v. Cunard Steam-Ship Co.*, 339 F. 2d 295 (2d Cir. 1964), *cert. denied*, 380 U. S. 976, 85 S. Ct. 1340, 14 L.Ed.2d 271 (1965); *North American Smelting Co. v. Moller S.S. Co.*, 204 F. 2d 384 (3d Cir. 1953); *Skibsaktieselskapet Siljestad v. United States*, 180 F. Supp. 957 (Ct. Claims 1960). An action for failure to deliver cargo pursuant to the bill of lading is a maritime action, even where the alleged breach occurs subsequent to discharge of the cargo on a pier. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F. 2d 800 (2d Cir. 1971); *David Crystal, Inc. v. Cunard Steam-Ship Co.*, *supra*, 339 F. 2d 295. Where an action within the federal maritime jurisdiction is brought in a state court under the "saving to suitors" clause of § 9 of the Judiciary Act of 1789,

1 Stat. 76-77, 28 U.S.C. 1333, the state court ordinarily must apply federal maritime law. *Kermarec v. Compagnie Generale*, 358 U. S. 625, 79 S. Ct. 406, 3 L.Ed.2d 550 (1959); *Pope & Talbot, Inc. v. Hawn*, 346 U. S. 406, 409, 74 S. Ct. 202, 98 L. Ed. 143 (1953); *Garrett v. Moore-McCormack Co.*, 317 U. S. 239, 249, 63 S. Ct. 246, 87 L. Ed. 239 (1942); *Carlisle Packing Co. v. Sandanger*, 259 U. S. 255, 259, 42 S. Ct. 475, 66 L. Ed. 927 (1922); *Knickerbocker Ice Co. v. Stewart*, 253 U. S. 149, 159, 40 S. Ct. 438, 64 L. Ed. 834 (1920); *Chelentis v. Luckenbach S.S. Co.*, 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171 (1918); *Frazier v. Waterman S.S. Corp.*, 206 Md. 434, 448, 112 A. 2d 221 (1955); *Standard, Etc. v. Ruckert Ter. Corp.*, 193 Md. 20, 24, 65 A. 2d 304 (1949).

The rights and duties of the parties with respect to the bill of lading are controlled by the provisions of The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1300 *et seq.*, and by the Harter Act, 46 U.S.C. 190 *et seq.* The provisions of COGSA are applicable from the time "the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. 1301(e). The Harter Act controls the period of time after discharge of the cargo from the vessel. *See Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F. 2d 720, 723 (2d Cir.), *cert. denied*, 375 U. S. 942, 84 S. Ct. 347, 11 L.Ed.2d 272 (1963). Specifically, the Harter Act forbids the insertion

> "in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in . . . proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import . . . shall be null and void and of no effect." 46 U.S.C. 190.

In the instant case, it is clear that the provisions of Irish Shipping's long form bill of lading, to the extent that those provisions may purport to relieve it from liability for an improper delivery, are null and void under 46 U.S.C. 190. *See*

*David Crystal, Inc. v. Cunard Steam-Ship Co., supra,* 339 F. 2d at 297. Thus, notwithstanding anything in the contract of carriage, Irish Shipping remained responsible for the cargo until there was a "proper delivery." As it is undisputed that the damage to the cargo occurred after its discharge, it must be determined whether there was a proper delivery prior to the contamination of the sugar.

A carrier's duty with respect to its cargo is ended when the carrier discharges the cargo onto a fit pier and gives due and reasonable notice to the consignee of the goods so as to afford him a fair opportunity to remove the goods or put them under proper care and custody. *The Eddy,* 5 Wall. 481, 18 L. Ed. 486 (1866); *Calcot, Ltd. v. Isbrandtsen Company,* 318 F. 2d 669 (1st Cir. 1963); *North American Smelting Co. v. Moller S.S. Co.,* 204 F. 2d 384 (3d Cir. 1953); *Kinderman & Sons v. Nippon Yusen Kaisha Lines,* 322 F. Supp. 939, 941 (E.D. Pa. 1971). Thus, actual delivery to the consignee or owner of the cargo is not required. *Kinderman & Sons v. Nippon Yusen Kaisha Lines, supra,* 322 F. Supp. at 941. Delivery to an agent of the consignee who is authorized to assume possession of the goods is sufficient. *Calcot, Ltd. v. Isbrandtsen Company, supra,* 318 F. 2d at 672.

In our view, the trial court correctly determined that a proper delivery took place when Irish Shipping discharged the sugar cargo on the pier apron into the custody of the Chesapeake Operating Company. In 1969, prior to the arrival of any of Pine Street's sugar, Pine Street had entered into an agreement with Chesapeake by which Chesapeake agreed to store the sugar shipped to Chesapeake's pier. The agreement provided for ordinary storage charges rather than charges based on demurrage rates which are typically assessed for storage beyond the "free time" period. Prior to the arrival of the *Irish Spruce* on May 13, 1970, Chesapeake had assumed custody and stored for the benefit of Pine Street prior shipments of sugar. Chesapeake continuously received instructions from Pine Street with respect to the sugar for a period of at least two months prior to the arrival of the *Irish Spruce.* On the day that the *Irish Spruce* sugar arrived, Pine Street received notice of the arrival and telephoned

Chesapeake with instructions concerning the sugar cargo. The following confirmatory letter was written:

"Chesapeake Operating Company
32 South Street
Baltimore, Maryland 21202

Attention: Mr. M. E. Curles

Dear Sirs:

"Confirming our telephone conversation of today, we would appreciate it if you would arrange to make deliveries from the Irish Spruce cargo, during the free time of that vessel, instead of from the Irish Poplar.

"This would apply to all open orders which are picked up during that time and also on any new orders which we may send you, to the extent that it is possible.

Very truly yours,

PINE STREET TRADING CORPORATION

L. A. Schupp"

The personnel of the *Irish Spruce* exercised no control as to the removal of the cargo from the pier apron into the shed. There is no evidence of any antimony dust on the pier apron. Under these circumstances, we conclude that delivery to Pine Street occurred when the cargo was stacked upon the pier apron by Chesapeake. Thereafter, Chesapeake assumed custody of the goods as agent for Pine Street. Consequently, the judgment in favor of Irish Shipping should stand.

### III.
*Pine Street v. Farrell Lines, Inc.*

Pine Street's claim against Farrell Lines is based upon Farrell Lines' alleged negligence in permitting the bags of

antimony ore to be discharged from its vessel, the *African Dawn*, in an unsound condition. Pine Street alleges, and there was evidence showing, that Farrell Lines knew or should have known that some of the bags were already ruptured prior to discharge, that others became ruptured during discharge, and that this might well lead to the contamination of the cargo of sugar on the pier. The trial court directed a verdict in favor of Farrell Lines at the conclusion of Pine Street's case, and Pine Street has challenged that action on appeal.

A threshhold issue is whether or not the alleged negligence of Farrell Lines constitutes a maritime tort so as to fall within the scope of maritime jurisdiction. Historically, admiralty jurisdiction over torts depended not upon where the tortious act or omission occurred, but rather where the damage was consummated. *See Victory Carriers, Inc. v. Law, supra*, 404 U. S. at 205-207; *The Troy*, 208 U. S. 321, 28 S. Ct. 416, 52 L. Ed. 512 (1908); *The Plymouth*, 3 Wall. 20, 33, 18 L. Ed. 125 (1866); *Penn Tanker Co. v. United States*, 409 F. 2d 514, 518 (5th Cir. 1969); *Firemen's Fund American Ins. Co. v. Boston Harbor Marina*, 406 F. 2d 917, 919 (1st Cir. 1969); *State, Department of Fish and Game v. S.S. Bournemouth*, 307 F. Supp. 922 (C.D. Cal. 1969). Thus, in cases of so-called "ship-to-shore" torts involving injury caused by a vessel on navigable water but done or consummated on land, no maritime jurisdiction existed. *See Victory Carriers, Inc. v. Law, supra*, 404 U. S. at 207; *Johnson v. Chicago & Pacific Elevator Co.*, 119 U. S. 388, 7 S. Ct. 254, 30 L. Ed. 447 (1886); *The Plymouth, supra; The Troy, supra*.

In 1948 Congress enacted the Extension of Admiralty Jurisdiction Act, 46 U.S.C. 740, in order to cure the inequities that resulted from strict application of the "locality" test of maritime jurisdiction. Section 740 provides, in pertinent part:

> "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding

that such damage or injury be done or consummated on land."

In the instant case, it seems clear that the claimed negligence of Farrell Lines in allegedly permitting defectively contained cargo to be discharged from its vessel, thereby causing damage to Pine Street's cargo on the pier, is a maritime tort within the scope of maritime jurisdiction, as enlarged by 46 U.S.C. 740.[1]

Farrell Lines does not dispute the maritime character of its alleged tortious conduct. Rather, it asserts that under 46 U.S.C. 740, as interpreted by the Supreme Court in *Gutierrez v. Waterman S.S. Corp.*, 373 U. S. 206, 83 S. Ct. 1185, 10 L.Ed.2d 297 (1963), Pine Street "had to establish that the damage complained of was the result of some negligent activity on the part of the ship's [the *African Dawn*] personnel at a 'time and place' within the limits of Farrell's presence and control." According to Farrell Lines, the *Irish Poplar* sugar was located on the opposite side of the pier from where the *African Dawn* was berthed, and was not contaminated by the antimony ore dust until the *African Dawn* had already left the pier. Furthermore, Farrell Lines argues, the *Irish Spruce* sugar did not arrive on the pier until six days after the *African Dawn* sailed from the pier. Farrell Lines concludes that it was entitled to a directed verdict because the "time and place" limitations for liability for tortious conduct under 46 U.S.C. 740, as set out by *Gutierrez v. Waterman S.S. Corp., supra,* were not met.

In *Gutierrez v. Waterman S.S. Corp., supra,* a longshoreman who was in the process of unloading a ship slipped on some loose beans which had spilled onto the dock out of broken bags in which the beans were contained. The shipowner argued that admiralty jurisdiction did not exist "because the impact of its alleged lack of care or

---

1. While asserting a martime tort against Farrell, Pine Street did not appear to assert a maritime tort against Chesapeake based upon any alleged negligence of Chesapeake, committed on the vessel as agent of Farrell Lines, in unloading ruptured bags of antimony. Instead, as pointed out in Part I, *supra,* the negligence of Chesapeake which was alleged seemed to be limited to conduct occurring on the pier and thus not a maritime tort. However, the pleadings are not entirely clear in this regard.

unseaworthiness was felt on the pier rather than aboard ship." 373 U. S. at 209. It argued that 46 U.S.C. 740 was limited to "injuries actually caused by the physical agency of the vessel or a particular part of it — such as when the ship rams a bridge or when its defective winch drops some cargo onto a longshoreman." *Id.* at 209-210. The shipowner also raised, as described by the Supreme Court, "[v]arious far-fetched hypotheticals," "such as a suit in admiralty for an ordinary automobile accident involving a ship's officer on ship business in port, or for someone's slipping on beans that continue to leak from these bags in a warehouse in Denver [the accident occurred in Puerto Rico]." *Id.* at 210. The Supreme Court rejected the shipowner's contentions in *Gutierrez,* holding that 46 U.S.C. 740 did operate to confer maritime jurisdiction in that case:

> "We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 U.S.C. § 740 when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and the impact of which is felt ashore at a time and place not remote from the wrongful act." (*Ibid.*)

Farrell urges that under *Gutierrez* the damage to Pine Street's cargo must have occurred while the *African Dawn* was still at the pier; otherwise the place of impact would have been too remote. We disagree. As *Gutierrez* states, the shoreward impact of the tort allegedly committed must be felt at a place not too remote "from the wrongful act." In this case, the wrongful act, *viz.* discharging defectively contained cargo, occurred while the ship was still at the pier. In our view, when a vessel commits a wrongful act while in the course of discharging cargo, and the impact of that act is felt at the same pier and within 300 feet of the point of discharge, there is a sufficient relationship between the wrongful act and the place of impact to establish jurisdiction under 46 U.S.C. 740.

Farrell Lines, Inc., further asserts that the time limitations of *Gutierrez* were not met in this case. The sugar

from the *Irish Poplar* was already on the pier when the cargo of antimony was discharged on May 7, 1970, and the contamination of that sugar could have occurred soon thereafter. The sugar from the *Irish Spruce* arrived on May 13, 1970, only six days after the discharge of the antimony. The sugar cargo from both vessels was found by an FDA inspector to be covered with antimony dust on May 18, 1970, and was officially detained on May 20, 1970. The discovery by the FDA of antimony on the sugar was, therefore, only eleven days after the antimony was discharged; thus the entire damage to the sugar had occurred sometime within eleven days from the time that Farrell had allegedly permitted leaking bags of antimony to be unloaded.

No clear precedent in the maritime cases has been brought to our attention as to the extent of the time limitations for recovery for maritime torts under 46 U.S.C. 740. It is therefore proper to look to the general tort law. *Igneri v. Cie. de Transports Oceaniques*, 323 F. 2d 257 (2d Cir. 1963), *cert. denied*, 376 U. S. 949, 84 S. Ct. 965, 11 L.Ed.2d 969 (1964); *David Crystal, Inc. v. Cunard Steam-Ship Company, supra*, 223 F. Supp. at 284.

In other areas of tort law, "[r]emoteness in time or space undoubtedly has its importance in determining whether the defendant has been a substantial factor in causing the harm." Prosser, *Torts* § 43 (4th ed. 1971). However, courts have been extremely reluctant to allow the mere passage of time to defeat recovery. Thus, a period of seven months between the negligent act and resultant injury, *Bishop v. St. Paul City Ry. Co.*, 48 Minn. 26, 50 N. W. 927 (1892), or even of ten years, *Western Union Telegraph Co. v. Preston*, 254 F. 229 (3d Cir. 1918), *cert. denied*, 248 U. S. 585, 39 S. Ct. 182, 63 L. Ed. 433 (1919), has not prevented recovery.

We do not believe that the time span between Farrell Lines' allegedly negligent conduct and the resultant injuries render Farrell Lines' tortious acts a remote cause of the injuries under *Gutierrez*. In *Gutierrez* the Supreme Court did not attempt to announce time and place limitations for recovery in all actions under 46 U.S.C. 740. The Court held only that "for the needs of this occasion" the shipowner's torts must not be felt at a time too remote from the

wrongful act. 373 U. S. at 210. It is instructive that the instant facts bear no resemblance to the "far-fetched hypotheticals" noted in *Gutierrez*. The impact of the allegedly tortious acts in this case was felt at the same pier and within a relatively short time span from the occurrence of the acts.

Moreover, we are not persuaded by Farrell Lines' further argument that, in order for it to be liable, it must be shown that Farrell Lines operated or controlled the pier where the damage to the sugar cargo was sustained. The Supreme Court in *Gutierrez* stated in language fully applicable here (373 U. S. at 211-212):

> "The force of these fact findings is not lessened by the contention that respondent did not control the pier or have 'even a right to control that locus,' 301 F. 2d, at 416. We doubt that respondent had no license to go upon the pier at which it was docked and clean up the loose beans, if it had wanted to; the beans were its cargo that it was unloading onto the pier. But we may put this aside, since control of the impact zone is not essential for negligence. The man who drops a barrel out of his loft need not control the sidewalk to be liable to the pedestrian whom the barrel hits. See *Byrne v. Boadle*, 2 H. & C. 722 (Exch.). And the same holds for the man who spills beans out his window, on which the pedestrian slips. Respondent allowed the cargo to be discharged in dangerous and defective bagging, from which beans were leaking before discharge of the cargo began. It had an absolute and nondelegable duty of care toward petitioner not to create this risk to him, which it failed to meet. When this lack of care culminated in petitioner's injury, respondent became legally liable to compensate him for the harm."

In light of the evidence that Farrell Lines knew or should have known that some of the antimony bags were ruptured prior to discharge and that others began to leak during

discharge, and the foreseeability that the leaking antimony dust might come into contact with other products on the pier, a directed verdict should not have been granted in favor of Farrell Lines.

## IV.
### Farrell Lines v. Chesapeake

Farrell Lines contends that, under maritime law and the Supreme Court's decision in *Ryan Co. v. Pan-Atlantic Corp.*, 350 U. S. 124, 76 S. Ct. 232, 100 L. Ed. 133 (1956), it is entitled to be indemnified by Chesapeake for expenses incurred in defending its case against Pine Street, based upon Chesapeake's breach of its warranty to Farrell Lines to perform in a workmanlike manner. Chesapeake, on the other hand, claims that Farrell Lines is not entitled to indemnity because Chesapeake's negligence occurred while it was acting as terminal operator and agent for the consignee of the antimony, not as stevedore or agent for Farrell Lines. Chesapeake argues that its liability to Farrell Lines is controlled by Maryland law which, it is asserted, does not recognize a right of indemnity in these circumstances. In light of the fact that this case will be remanded for a new trial, and the evidence and findings in the new trial with respect to the negligence of both Farrell Lines and Chesapeake may well be different, we believe that it would be premature to discuss this issue. The evidence and findings upon re-trial may well have a bearing on the determination of the indemnity issue.

> *Judgment affirmed in part and reversed in part, and case remanded for further proceedings not inconsistent with this opinion.*
>
> *Costs to be paid as follows: one-third by Pine Street Trading Corp.; one-third by Chesapeake Operating Company; and one-third by Farrell Lines, Inc.*