753 A.2d 69

Lawrence MATTHEWS et al.

v.

Stephen K. HOWELL.

No. 131, Sept. Term, 1999.

Court of Appeals of Maryland.

June 8, 2000.

154

---

David W. Skeen (Wright, Constable & Skeen, LLP, on brief), Baltimore, for appellants.

Tina L. Snee (Jeffrey S. Danzig of Brandt, Jennings, Roberts, Davis & Snee, PLLC, on brief), Falls Church, VA, for appellee.

**156**

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

CATHELL, Judge.

▮ Marcia Ault, appellant, the personal representative of the estate of Kimberly Matthews, decedent, and Lawrence Matthews, appellant, the father and next friend of Brittany and Travis Matthews, the children of Kimberly Matthews, brought two claims against Stephen Howell, appellee, in the Circuit Court for Anne Arundel County. The first claim was a survivors' action alleging negligence and the second claim alleged Ms. Matthews' wrongful death. Because the allegations in the complaint involved Ms. Matthews' drowning while a guest on a boat captained by appellee, appellants relied on maritime law which is applicable under the "saving to suitors" clause of the Judiciary Act of 1789, codified in 28 U.S.C. § 1333(1) (1994).[1] This appeal generally involves whether the circuit court should have applied maritime law. The circuit court ruled it should not and granted summary judgment to

---

1. 28 U.S.C. § 1333 reads in relevant part:

 **§ 1333. Admiralty, maritime and prize cases**
 The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
 (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
 Although the statute, on its face, confers exclusive maritime jurisdiction to the federal courts, it has long been held that the "saving to suitors" clause allows maritime cases based on common-law claims traditionally brought in state courts to proceed in those courts, provided that they apply the federal law pertaining to maritime liabilities. *See, e.g., Pine Street Trading Corp. v. Farrell Lines, Inc.*, 278 Md. 363, 379–80, 364 A.2d 1103, 1114 (1976) ("Where an action within the federal maritime jurisdiction is brought in a state court under the 'saving to suitors' clause of § 9 of the Judiciary Act of 1789, 1 Stat. 76–77, 28 U.S.C. [§ ] 1333, the state court ordinarily must apply federal maritime law."); *Orient Overseas Line v. Globemaster Baltimore, Inc.*, 33 Md.App. 372, 382 n. 1, 365 A.2d 325, 334 n. 1 (1976) ("The uncontested case law has held that under the provisions of this clause, a suitor asserting an *in personam* admiralty claim may elect to sue in a 'common law' state court through an ordinary civil action rather than in federal court under the admiralty jurisdiction."), *cert. denied*, 279 Md. 684 (1977).

appellee. We hold that the circuit court should have applied maritime law and, accordingly, reverse.

## I. Background

Appellee, who operated a mortgage company, visited Robert and Deborah Parks, personal friends, on September 18, 1996, to take pictures of their home. Ms. Matthews, a friend of Ms. Parks, was visiting the Parks home. Appellee invited all three to join him that evening on his boat, a 38–foot, 1984 Wellcraft Scarab.

All four met at Oak Grove Marina on the South River, from which they eventually boated to Cantler's Riverside Inn on Mill Creek. They arrived around 9 to 9:30 p.m., and stayed until approximately 11 to 11:30 p.m., watching the Baltimore Orioles game. During that time, all four consumed a variety of alcoholic drinks.

En route back to Oak Grove Marina, appellee operated the boat from the helm on the starboard (right) side, while Ms. Parks and Ms. Matthews were standing on deck. Ms. Parks stood on the port (left) side, while Ms. Matthews stood in the middle. Mr. Parks went below to light a cigarette. By now, the conditions had worsened: the wind had increased, the water had gotten choppy, and it was dark. While traversing the Chesapeake Bay near Greenbury Point, the boat had been traveling at a planing speed of about forty knots. At some point, appellee abruptly throttled back thereby slowing the boat. He then announced to Ms. Matthews that he wanted to take a quick swim, and dove into the Bay, jumping from the seat at the helm. Appellee and the witnesses differ on whether the boat engines were still engaged and, if so, whether the boat was in gear or drifting in neutral.[2] The boat

---

2. At some point, the key to the port engine broke off in the ignition while it was engaged. Ms. Parks' deposition indicates this happened on their trip to Cantler's Riverside Inn and that appellee fixed it. Appellee and Mr. Parks claimed in their depositions that the key broke sometime during the incident. Mr. Parks stated that, in attempting to rescue the others, he could only start the starboard engine.

apparently was not anchored. Appellee did not ask anyone to take the helm or to post watch.

No one knows how or why, but Ms. Matthews went into the water immediately after appellee. Ms. Parks apparently was not paying attention when Ms. Matthews hit the water. Mr. Parks was still below deck and appellee was already in the water and did not see Ms. Matthews dive or fall in after him. Some evidence in the record indicates that Ms. Matthews may have said earlier in the evening that she would like to take a swim. Other evidence, included in a report prepared by appellant's proposed expert witness, indicates that she may have fallen into the Bay, perhaps because of the shift in the boat's plane after appellee dove into the water. Either way, as soon as Ms. Matthews hit the water, she began to panic.

All three witnesses were deposed prior to the trial court's award of summary judgment. Their versions of what happened after Ms. Matthews went into the water differ. In his deposition, appellee claimed that, after he jumped into the Bay, he attempted to board the boat by stepping on the "trim tab" on the stern (rear) of the boat. It was at this point that he heard a splash and Ms. Matthews scream for help. Appellee claims that Ms. Matthews was about twenty feet from the boat. He stated that he tried to rescue Ms. Matthews, but, in her state of panic, she resisted. Ms. Parks threw him and Ms. Matthews a life jacket, but she missed and the wind blew it away. Ms. Parks then jumped in the water in an attempt to save the other two. Mr. Parks came from down below and began to maneuver the boat toward the three in the water. Appellee claims that he dragged Ms. Matthews and Ms. Parks to the port side of the boat. He grabbed a cleat with his left hand, while facing toward the stern. He shouted to Mr. Parks to put the boat in neutral, but it continued to move and appellee could not hold on to the cleat. He also stated that he grabbed a spotlight hanging from the port side of the boat, which was plugged into a lighter at the starboard helm, but the spotlight cord ripped out of the lighter and sank into the water. Eventually, he was separated from the women and

drifted away before being rescued by Mr. Parks. He and Mr. Parks then recovered Ms. Parks from the water.

Ms. Parks, in her deposition, stated that Ms. Matthews was about five feet from the boat when she heard her scream. She too described throwing the only life jacket she could find to Ms. Matthews, which the wind blew away. Ms. Parks then jumped into the water. After her husband brought the boat astern toward the swimmers, Ms. Parks claims that she and Ms. Matthews were on the starboard side of the boat, separated from appellee, who was on the port side. Contrary to appellee's claim that he grabbed the spotlight on the port side and ripped it out, Ms. Parks stated that she grabbed the spotlight and it ripped out, leaving her and Ms. Matthews to drift. Her statements also differ in that she claims her husband pulled appellee out of the water at that point. Although not specifically asked about the matter, Ms. Parks did not describe any attempt by appellee to rescue Ms. Matthews. Mr. Parks deposition reflects that he did not see either alleged rescue attempt.

After helping appellee and Ms. Parks into the boat, Mr. Parks called 911 on appellee's cellular phone at 11:55 p.m. A United States Coast Guard boat arrived at 12:38 a.m., on September 19, followed by a Maryland Department of Natural Resources boat at 1:10 a.m., and a helicopter, all of which conducted a search for Ms. Matthews. The search was unsuccessful. Two days later, on September 21, 1996, after receiving a call from a passing boater, the Department of Natural Resources recovered Ms. Matthews' body, which was fully clothed, including her boots. An autopsy revealed that the cause of death was drowning.

Appellants subsequently brought suit against appellee in the Circuit Court for Anne Arundel County, alleging that maritime law applied pursuant to the "saving to suitors" clause of 28 U.S.C. § 1333(1). Two claims were brought: (1) a survivor's claim alleging appellee's negligence in a number of matters, and (2) a wrongful death claim based on the same alleged

acts.[3] Appellee subsequently moved for summary judgment, which the circuit court granted, ruling that (1) appellee was not negligent in his operation of the boat; (2) maritime law did not apply; (3) appellee had no duty to rescue Ms. Matthews under Maryland law; and (4) appellee owed Ms. Matthews no other duty of care under Maryland law and did not proximately cause her death. Appellants filed a timely appeal to the Court of Special Appeals, and we granted a writ of certiorari on our motion prior to proceedings before the lower appellate court. They present two issues to this Court:

I. Did the trial court err in refusing to apply federal maritime law to the wrongful death and survivorship negligence claims against the owner/operator of a pleasure boat arising out of a drowning of a guest in the navigable waters of the United States?

II. Did the trial court err in its factual findings and in concluding that no genuine issue as to any material fact existed and that as a matter of law the owner of a pleasure craft owed no duty to his guest under Maryland law?

---

**3.** Paragraph five of the complaint alleged that appellee "was negligent in failing to operate the boat in a safe manner and see to the safety of its passengers," that he "abandoned the helm without making the proper preparations," and "the absence of proper direction of and participation in the rescue operation." Paragraph six alleged:

6. [Appellee] was negligent in the operation of the boat in making the decision to leave the helm of a boat while making way; for failing to operate the boat in a reasonable and prudent manner; for failing to make necessary provisions for the safety and security of his passengers; for deciding to go swimming in a well traveled area on a windy and dark night; for failing to designate a competent or capable individual to be in charge of the boat; for failing to provide a reasonable means of reboarding; for failing to assure that the boat would not move away; for failing to warn the passengers of the difficulties of going swimming under the circumstances; for failing to ascertain the capacity of the decedent; for failing to advise the remaining passengers on board of his intentions; for failing to instruct the remaining passengers as to boat operation and rescue measures; for failing to ascertain whether the remaining passengers were capable of operating the boat; and for failing to direct or participate in rescue attempts; for operating a boat while intoxicated or impaired; and for other reasons as may be discovered prior to trial.

## II. Standard of Review

The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact, which is sufficiently material to be tried. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 205–06, 680 A.2d 1067, 1077 (1996); *Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564, 567–68 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170, 171 (1980). In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists and, if not, whether the movant is entitled to judgment as a matter of law. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949, 951 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365, 366 (1989); *King v. Bankerd,* 303 Md. 98, 110–11, 492 A.2d 608, 614 (1985) (citations omitted). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d at 614 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367, 374 (1973). Once the moving party has provided the court with sufficient grounds for summary judgment, the nonmoving party must produce sufficient evidence to the trial court that a genuine dispute to a material fact exists. *See, e.g., Hoffman Chevrolet, Inc. v. Washington County Nat'l Sav. Bank,* 297 Md. 691, 712, 467 A.2d 758, 769 (1983).

The trial court, in accordance with Maryland Rule 2–501(e), shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as

to any material fact and that [the moving party] is entitled to judgment as a matter of law." This Court also has stated that "[t]he standard of review for a grant of summary judgment is whether the trial court was legally correct." . *Goodwich,* 343 Md. at 204, 680 A.2d at 1076; *see also King v. Board of Educ. of Prince George's County,* 354 Md. 369, 376, 731 A.2d 460, 464 (1999); *Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997); *Hartford Ins. Co.,* 335 Md. at 144, 642 A.2d at 224; *Gross,* 332 Md. at 255, 630 A.2d at 1160; *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990) (citations omitted). We review the trial court's legal conclusions in a summary judgment order *de novo.* *See Green v. H & R Block, Inc.,* 355 Md. 488, 502, 735 A.2d 1039, 1047 (1999); *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358, 362 (1999).

### III. When is Maritime Law Applicable?

Originally, maritime or admiralty law was applicable when any claim arose upon the navigable waters of the United States. *See The Plymouth,* 70 U.S. (3 Wall) 20, 36, 18 L.Ed. 125 (1866) ("Every species of tort, however occurring, and whether on board a vessel or not, if upon the high seas or navigable waters, is of admiralty cognizance."). That long-standing rule changed, however, with the United States Supreme Court's decision in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). *Executive Jet Aviation* involved an aviation claim, in which a plane taking off from a runway at a municipal airport, hit a flock of birds, lost engine power, and crashed into Lake Erie, sinking to its bottom. The plaintiffs in that case sought damages under traditional maritime jurisdiction. The Supreme Court, finding the exercise of maritime jurisdiction over a plane crash to be too tenuous, established a "nexus" test whereby, to exercise maritime jurisdiction, a court must find, not only that the action accrued upon or in navigable waters, but that the incident alleged in the claim bears a "significant relationship to traditional maritime activity." *Id.* at 268, 93

S.Ct. at 504, 34 L.Ed.2d 454. In reaching that new test, the Supreme Court reasoned:

This locality test ... was established and grew up in an era when it was difficult to conceive of a tortious occurrence on navigable waters other than in connection with a water-borne vessel....

But it is the perverse and casuistic borderline situations that have demonstrated some of the problems with the locality test of maritime tort jurisdiction....

Other serious difficulties with the locality test are illustrated by cases where the maritime locality of the tort is clear, but where the invocation of admiralty jurisdiction seems almost absurd. If a swimmer at a public beach is injured by another swimmer or by a submerged object on the bottom, or if a piece of machinery sustains water damage from being dropped into a harbor by a land-based crane, a literal application of the locality test invokes not only the jurisdiction of the federal courts, but the full panoply of the substantive admiralty law as well.... [Some] courts ... have held in such situations that a maritime locality is not sufficient to bring the tort within federal admiralty jurisdiction, but that there must also be a maritime nexus....

... More recently, commentators have actively criticized the rule of locality as the sole criterion for admiralty jurisdiction, and have recommended adoption of a maritime relationship requirement as well.

*Id.* at 254–57, 93 S.Ct. at 497–99, 34 L.Ed.2d 454. The Supreme Court also noted that "another indictment of [the locality] test is to be found in the number of times the federal courts and the Congress, in the interests of justice, have had to create exceptions to it in the converse situation—*i.e.*, when the tort has no maritime locality, but does bear a relationship to maritime service, commerce, or navigation." *Id.* at 259, 93 S.Ct. at 500, 34 L.Ed.2d 454. This included applying the doctrine of seaworthiness and the Jones Act, 46 U.S.C. App. § 688 (1994), which regulated injuries to seamen, to land-

based acts conducted for the purpose of maritime commerce. The Court also noted the "Extension of Admiralty Jurisdiction Act," 46 U.S.C. § 740, which allows maritime jurisdiction when a waterborne vessel causes damage to a person or thing on land. These various exceptions to the locality rule led the Court to believe that "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test." *Id.* at 261, 93 S.Ct. at 501, 34 L.Ed.2d 454. Ultimately, the Court held that

[i]t is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

*Id.* at 268, 93 S.Ct. at 504, 34 L.Ed.2d 454.

Ten years later, the Supreme Court discussed maritime jurisdiction again in *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), a case in which two pleasure boats collided, resulting in the death of a passenger in one of the boats. The Court held that the collision was actionable under federal maritime jurisdiction. *Id.* at 674, 102 S.Ct. at 2658, 73 L.Ed.2d 300. In doing so, the Court rejected the insurer's argument that the traditional maritime activity involved in the claim has to be commercial in nature. The Court stated:

[T]here is no requirement that "the maritime activity be an exclusively commercial one." . . .

. . . This argument is premised on the faulty assumption that, absent this relationship with *commercial* activity, the need for uniform rules to govern conduct and liability disappears, and "federalism" concerns dictate that these torts be litigated in the state courts.

. . . This [federal] interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to

uniform rules of conduct.... For example, if these two boats collided at the mouth of the St. Lawrence Seaway, there would be a substantial effect on maritime commerce, without regard to whether either boat was actively, or had been previously, engaged in commercial activity. Furthermore, admiralty law has traditionally been concerned with the conduct alleged to have caused this collision by virtue of its "navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters." The potential disruptive impact of a collision between boats on navigable waters, when coupled with the traditional concern that admiralty law holds for navigation, compels the conclusion that this collision between two pleasure boats on navigable waters has a significant relationship with maritime commerce.

*Id.* at 674–75, 102 S.Ct. at 2658, 73 L.Ed.2d 300 (citation omitted) (footnote omitted). Thus, the Court held that "[b]ecause the 'wrong' here involves the negligent operation of a vessel on navigable waters, ... it has a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction...." *Id.* at 674, 102 S.Ct. at 2658, 73 L.Ed.2d 300. The Court recognized that its holding was made "[i]n light of the need for uniform rules governing navigation, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty and confusion that would necessarily accompany a jurisdictional test tied to the commercial use of a given boat...." *Id.* at 677, 102 S.Ct. at 2659, 73 L.Ed.2d 300.

The next major Supreme Court case discussing maritime jurisdiction was *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). *Sisson* involved a fire that started on a yacht moored at a marina on Lake Michigan, which destroyed the yacht, and damaged the marina and several other boats nearby. The *Sisson* Court noted that *Foremost Insurance* had created two essential prongs to the "nexus" test: (1) that the incident caused a "potential hazard to maritime commerce" and (2) that the actions surrounding the incident bore a "substantial relationship to traditional maritime activi-

ty." *Id.* at 362, 110 S.Ct. at 2895–96, 111 L.Ed.2d 292. Regarding the "potential hazard" element, the Court reasoned:

Certainly, such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels....

... We determine the potential impact of a given type of incident by examining its general character. The jurisdictional inquiry does not turn on the *actual* effects on maritime commerce of the fire on Sisson's vessel; nor does it turn on the particular facts of the incident in this case, such as the source of the fire or the specific location of the yacht at the marina, that may have rendered the fire on the *Ultorian* more or less likely to disrupt commercial activity. Rather, *a court must assess the general features of the type of incident* involved to determine whether such an incident is likely to disrupt commercial activity. Here, the general features—a fire on a vessel docked at a marina on navigable waters—plainly satisfy the requirement of potential disruption to commercial maritime activity.

*Id.* at 362–63, 110 S.Ct. at 2896, 111 L.Ed.2d 292 (third emphasis added). The Court then discussed the second element that the alleged incidents substantially relate to a traditional maritime activity:

Our cases have made clear that the relevant "activity" is defined not by the particular circumstances of the incident, but by the general conduct from which the incident arose.... Were courts required to focus more particularly on the causes of the harm, they would have to decide to some extent the merits of the causation issue to answer the legally and analytically antecedent jurisdictional question. Thus, in this case, we need not ascertain the precise cause of the fire to determine what "activity" Sisson was engaged in; rather, the relevant activity was the storage and maintenance of a vessel at a marina on navigable waters.

... Moreover, a narrow focus on navigation would not serve the federal policies that underlie our jurisdictional

test. The fundamental interest giving rise to maritime jurisdiction is "the protection of maritime commerce," and we have said that that interest cannot be fully vindicated unless "*all* operators of vessels on navigable waters are subject to uniform rules of conduct". *The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels,* commercial or noncommercial.

*Id.* at 364–67, 110 S.Ct. at 2897–98, 111 L.Ed.2d 292 (second emphasis added) (citations omitted) (footnote omitted).

 Thus, in *Foremost Insurance* and *Sisson,* the Supreme Court recognized that examining an incident for the purposes of maritime jurisdiction is not to be done by subjecting the minutia of a case to the "potential hazard" and "traditional maritime activity" tests; rather, the "general" aspects of the case are to be reviewed under the two prongs. At the same time, those tests are to be defined somewhat liberally. A "potential hazard" to maritime commerce need not include an actual hazard in the case at hand. The "potential hazard" can also be hypothetical, though not fantastical. A "traditional maritime activity" may include any maritime-related activity, not just marine navigation.

In its most recent discussion of maritime jurisdiction, *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), the Supreme Court applied the "nexus" test in this more liberal manner. In that case, the Court reviewed whether maritime jurisdiction applied to a construction accident in the Chicago River, which caused several downtown Chicago buildings to flood. The tortfeasor, Great Lakes Dredge & Dock, had contracted with the City of Chicago to replace pilings around the piers of several bridges spanning the river. The impact from driving the pilings into the riverbed apparently caused structural damage to a City-owned freight tunnel running underneath the river, which subsequently caused the flooding. The Court reviewed the facts under the rationale of *Sisson:*

The first *Sisson* test turns ... on a description of the incident at an intermediate level of possible generality. To speak of the incident as "fire" would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie–up facilities would have ignored, among other things, the capacity of pleasure boats to endanger commercial shipping that happened to be nearby. We rejected both extremes and instead asked whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.

Following *Sisson,* the "general features" of the incident at issue here may be described as damage by a vessel in navigable water to an underwater structure. So characterized, there is little question that this is the kind of incident that has a "potentially disruptive impact on maritime commerce." As it actually turned out in this suit, damaging a structure beneath the riverbed could lead to a disruption in the water course itself; and, again as it actually happened, damaging a structure so situated could lead to restrictions on the navigational use of the waterway during required repairs.

*Id.* at 538–39, 115 S.Ct. at 1051, 130 L.Ed.2d 1024 (citation omitted). Regarding the second *Sisson* test, the Court held that "the 'activity giving rise to the incident' in this suit, should be characterized as repair or maintenance work on a navigable waterway performed from a vessel. Described in this way, there is no question that the activity is substantially related to traditional maritime activity...." *Id.* at 540, 115 S.Ct. at 1051, 130 L.Ed.2d 1024 (citation omitted).

### IV. Is Maritime Law Applicable in this Case?

 The parties do not dispute, as they cannot, that the Chesapeake Bay is a navigable waterway of the United States. Thus, the "locality" test for the application of federal maritime law is satisfied. The trial court below did not address the first prong of the "nexus" test, i.e., whether the incident surrounding the drowning created a potential hazard to maritime

commerce. Appellee does not challenge appellants' argument that the potential hazard test applies. Noting this, in addition to the facts of the case, we conclude that the "potential hazard" test has been satisfied. During the incident, appellee had stopped his boat in the middle of a major shipping waterway, the Chesapeake Bay. His boat remained adrift in that waterway while Mr. Parks rescued him and Ms. Parks, which, according to the depositions, took approximately twenty minutes. The parties remained adrift in the area while search parties arrived. Those search parties in turn spent a great amount of time scouring the area of the navigable waterway for Ms. Matthews. Although there is no evidence of any actual disruption of maritime commerce, travel by any other vessel through that portion of the Chesapeake Bay would have been restricted by the search effort. *See Polly v. Estate of Carlson,* 859 F.Supp. 270, 272 (E.D.Mich.1994) ("That men were overboard in an emergency situation by itself is likely to disrupt commercial activity; this event ordinarily occasions both air and sea searches and rescue operations. Similarly, leaving a vessel to float unmanned in open water has the potential to disrupt commercial navigation." (citations omitted)). Moreover, the search effort by the Coast Guard and the Maryland Department of Natural Resources Police for a person who has gone overboard from a vessel is a traditional maritime activity, in and of itself, as the maritime history of the country, i.e., its lifesaving stations and rescue activities, indicates.

■ The dispute in this case thus revolves around whether appellee's actions, or omissions, were "substantially related to a traditional maritime activity" under the second "nexus" test. We note initially that appellee argues that this test does not apply because he "was not engaged in commercial shipping at the time of the accident." While this may be true in fact, it is clearly incorrect, if not disingenuous, to analyze the case in purely commercial terms after *Foremost Insurance* and *Sisson. See also Yamaha Motor Corp. v. Calhoun,* 516 U.S. 199, 206, 116 S.Ct. 619, 623, 133 L.Ed.2d 578 (1996) (noting that admiralty jurisdiction existed when a jet skier was killed after

striking another vessel). As those cases point out, the need for uniform rules of maritime conduct, and the potential to disrupt *others* involved in commercial maritime activity, extends to all vessels, commercial or noncommercial. *See supra.* Thus, the noncommercial nature of the maritime "activity" involved in this case is irrelevant under the "nexus" test.

Appellee would also have us interpret the general conduct represented in the incident as "swimming and diving." In doing so, he notes the United States Court of Appeals for the Fourth Circuit's opinion in *Foster v. Peddicord,* 826 F.2d 1370 (4th Cir.1987). In that case, Mr. Foster, a guest on Mr. Peddicord's boat, which was anchored in a tributary of the Chesapeake Bay, dove into the water and was injured. The Fourth Circuit held that maritime law did not apply. *Id.* at 1376.

*Foster* is inapposite for two reasons. First, as appellants point out, the Fourth Circuit noted that it by no means suggested "that the act of diving from a boat could never provide a nexus for the exercise of admiralty jurisdiction. Under certain circumstances this activity could bear a relationship to navigational conduct." *Id.* at 1376 n. 3; *see also Wright v. United States,* 883 F.Supp. 60, 63 (1994) (finding that a maritime "nexus" existed when a woman dove from a pleasure boat and injured her finger). Second, pursuant to its earlier statement in *Oliver ex rel. Oliver v. Hardesty,* 745 F.2d 317, 320 (4th Cir.1984), that the "proper emphasis is on the navigation of the pleasure boat involved," *Foster* focused on the lack of "navigational error" because the boat was anchored. *See id.* at 1375, 1376. After the application of maritime law to a fire in *Sisson* and to piledriving in *Grubart,* however, it is clear that marine navigation is not the only activity to which maritime jurisdiction applies.[4] *See Sisson,*

---

4. Counsel for appellee also cites *Brock v. Lewis,* 86 F.3d 1148 (4th Cir.), *cert. denied,* 519 U.S. 993, 117 S.Ct. 482, 136 L.Ed.2d 377 (1996), for the same proposition. Appellee's counsel does not indicate that *Brock* is an unreported opinion and that the citation given is to a disposition table. We find this citation unpersuasive. We are also unpersuaded by appellee's citation of *Kunreuther v. Outboard Marine Corp.,* 715 F.Supp.

497 U.S. at 367, 110 S.Ct. at 2898, 111 L.Ed.2d 292 ("The need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to any other activities traditionally undertaken by vessels.").

We reject the trial court's reliance on *Souther v. Thompson*, 754 F.2d 151 (4th Cir.1985), for similar reasons. *Souther* involved an accident between two water skiers being towed from the same boat. The Fourth Circuit held "that admiralty jurisdiction d[id] not exist ... because the controversy between the parties does not arise out of an alleged navigational error." *Id.* at 153. As noted, *supra*, maritime "activity" is not restricted to navigation only. *Souther* is also factually distinguishable.

We also reject appellee's reliance on *Williams v. Ingram*, 320 Ark. 615, 899 S.W.2d 454 (1995), and *Woltering v. Outboard Marine Corp.*, 245 Ill.App.3d 684, 185 Ill.Dec. 791, 615 N.E.2d 86, *appeal denied*, 152 Ill.2d 582, 190 Ill.Dec. 912, 622 N.E.2d 1229 (1993). In *Williams*, 320 Ark. at 621–22, 899 S.W.2d at 458, a drowning case similar to the case *sub judice*, the Arkansas Supreme Court rejected the application of maritime law largely because the decedent's wife had not raised maritime law in the trial court below and was given adequate jury instructions based on state tort law concerning the duty of care owed to the decedent. We disagree with the holding in *Woltering*, in which the decedent was killed after falling from a boat while it was being operated on the Mississippi River. The Illinois Appellate Court held that maritime law did not apply, noting that "the relevant activity giving rise to the incident was aquatic recreation involving a pleasure boat," and that there was no "evidence that negligent navigation played a role in the accident." *Woltering*, 245 Ill.App.3d at 687, 688, 185 Ill.Dec. 791, 615 N.E.2d at 88, 89. Accidents occurring during the navigation of a vessel, whether the navigation itself

---

1304 (E.D.Pa.1989), which, as appellee does note, was later set aside by the federal district court in that case because maritime jurisdiction was conferred by federal statute. *See Kunreuther v. Outboard Marine Corp.*, 757 F.Supp. 633 (E.D.Pa.1991).

was negligent or not, generally fall within the "nexus" test. *See Mink v. Genmar Indus., Inc.*, 29 F.3d 1543, 1545–47 (11th Cir.1994) (holding that maritime jurisdiction extended to a products liability action when the injured party broke a vertebra during operation of a speed boat, due to the lack of a handrail). That the involved activity was recreational also had no import under the edicts of *Foremost Insurance*.[5]

Finally, we reject appellee's "swimming and diving" analysis based on our own independent analysis of this case under the "nexus" test. As we have noted, the Supreme Court's interpretation of the "nexus" test and how that test is to be applied requires us to take a "general" view of the incident involved. To call the incident in the case *sub judice* "swimming and diving" would focus on one specific fact in the case—that Ms. Matthews was not on the boat at the time of her death. Factually, there is more to this case than just "swimming and

---

5. *Vann v. Willie*, 38 Md.App. 49, 379 A.2d 411 (1977), *aff'd*, 284 Md. 182, 395 A.2d 492 (1978), applied state common law when a swimmer was struck by a boat towing a water skier. In *Vann*, the Court of Special Appeals relied on *Executive Jet Aviation*. Because we held that there was not any proximate causation under either state or federal law, we did not endorse the Court of Special Appeals' position. We stated: "it was unnecessary for the Court of Special Appeals to address the issue as to when . . . admiralty law would be applicable . . .; we still regard this question as unanswered." 284 Md. at 183–84, 395 A.2d at 493. Moreover, the Court of Special Appeals construed "traditional maritime activities" to mean commercial activity, 38 Md.App. at 61 n. 19, 379 A.2d at 418 n. 19, an interpretation that was clearly rejected by *Foremost Insurance*, as noted, *supra*. The Court of Special Appeals also stated that "swimming and waterskiing" were not traditional maritime activities. *Id.* at 61, 379 A.2d at 418. Mr. Vann, however, had been struck by a negligently operated boat while swimming. (The claim before the court was for the negligent entrustment of the boat to the captain.) A number of cases hold that swimmers struck by vessels may pursue claims under federal maritime law. *See Neely v. Club Med Management Servs., Inc.*, 63 F.3d 166, 178–80 (3d Cir.1995); *In re Paradise Holdings, Inc.*, 795 F.2d 756, 758–60 (9th Cir.), *cert. denied*, 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 705 (1986); *Oliver*, 745 F.2d 317, *Medina v. Perez*, 733 F.2d 170 (1st Cir.1984), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 774 (1985); *Bodnar v. Hi–Lex Corp.*, 919 F.Supp. 1234, 1238–40 (N.D.Ind.1996); *Schumacher v. Cooper*, 850 F.Supp. 438, 441–42, 447 (D.S.C.1994); *Choat v. Kawasaki Motors Corp.*, 675 So.2d 879, 880–84 (Ala.1996).

diving," particularly when compared with the facts in the "swimming and diving" cases cited by appellee, *Foster* and *Williams*, as well as another "swimming and diving" case cited by appellee, and relied on by the trial court below, *Smith v. Knowles*, 642 F.Supp. 1137 (D.Md.1986).[6] In those cases, the injured party clearly dove from the boat voluntarily. In the case *sub judice*, it is unclear whether Ms. Matthews dove or fell into the water. *Cf. Polly*, 859 F.Supp. at 273 (finding that, in a drowning accident, navigation was the relevant maritime activity because it was unknown how the captain and his passenger ended up in the water). In addition, if Ms. Mat-

---

**6.** Appellants also note that *Smith* and *Foster* relied on a four-factor test adopted by the Fourth Circuit in *Oman v. Johns–Manville Corp.*, 764 F.2d 224, 230 (4th Cir.1985). In *Sisson*, the Supreme Court was asked to adopt a similar multifactor test in determining the existence of maritime jurisdiction. The Court declined, noting that "the formula initially suggested by *Executive Jet Aviation* and more fully refined in *Foremost* and in this case provides appropriate and sufficient guidance to the federal courts." *Sisson*, 497 U.S. at 366 n. 4, 110 S.Ct. at 2898 n. 4, 111 L.Ed.2d 292 (1990). A similar request to apply a multifactor test was posed to the Court in *Grubart*, which the Court again rejected, with stronger language:

> It is worth recalling that the *Sisson* tests are aimed at the same objectives invoked to support a new multifactor test, the elimination of admiralty jurisdiction where the rationale for the jurisdiction does not support it. . . .
>
> . . . .
>
> . . . For better or worse, the case law has thus carved out the approximate shape of admiralty jurisdiction in a way that admiralty lawyers understand reasonably well. As against this approach, so familiar and relatively easy, the proposed four- or seven-factor test would be hard to apply, jettisoning relative predictability for the open-ended rough-and-tumble of factors, inviting complex argument in a trial court and a virtually inevitable appeal.
>
> . . . [I]nvoking a district court's admiralty jurisdiction under 28 U.S.C. § 1333 . . . has traditionally been quite uncomplicated.
>
> Reasons of practice, then, are as weighty as reasons of theory for rejecting the city's call to adopt a multifactor test for admiralty jurisdiction. . . .

*Grubart*, 513 U.S. at 544–45, 547–48, 115 S.Ct. at 1053–54, 1055, 130 L.Ed.2d 1024. Appellants argue that the Supreme Court's disagreement with multifactor tests in *Sisson* and *Grubart* implicitly overrules the cases appellee cites, *Smith* and *Foster*. We decline to address that issue, but note that, as appellants point out, it is inappropriate to apply a multifactor test when determining whether maritime law applies in a given case.

thews did dive into the water, she did so at the implied encouragement of appellee, who, unlike the boat operators in the cases he cites, dove into the water himself, despite the potentially hazardous swimming conditions. The cases cited by appellee do not involve allegations, as this case does, that the boat captain abandoned his helm, and did so without taking proper precautions for the safety of himself and his guests.

Applying a broader view of the "traditional maritime activity" in this case, we would equate appellee's actions to maritime navigation, or, to be more accurate, the lack of proper navigation. Appellee's arguments imply, and the trial court below agreed, that because he was not physically operating the boat at the time of Ms. Matthews' drowning, he was not engaged in any maritime activity. "Navigation" involves much more than the simple operation of a vessel. *The Random House Dictionary of the English Language* 954 (unabr. ed.1983), for instance, defines "navigate" in part as "**2.** to direct or manage (a ship . . . ) on its course. **3.** to ascertain or plot and control the course or position of (a ship . . . )" and "navigation" as "**2.** the art or science of plotting, ascertaining, or directing the course of a ship . . . ."

What appellants allege in their complaint is appellee's failure, as captain, to manage, direct, and position his vessel properly. For appellee to argue that he cannot be held liable for negligent navigation because he was not behind the helm at the time of the accident is spurious. First, appellee clearly navigated the boat, in the operational sense of the word, by stopping it and leaving it adrift in a major navigable waterway prior to his diving from the boat. Next, he apparently chose to abandon the helm allegedly without taking the proper precautions that appellants claim maritime law requires: he did not warn the others of his intentions, failed to appoint anyone to maintain the helm or act as a lookout, did not provide adequate safety gear or procedures, and failed to provide a means of ingress to the boat. Finally, appellants allege that appellee failed to assist in the rescue of a woman

overboard from his vessel. All of these allegations, if proved, would support appellants' claim that appellee failed to properly manage or direct his boat under the duties generally assessed upon maritime captains by federal common law.

The United States District Court for the District of Hawai'i reached a similar conclusion in the case of *In re Pacific Adventures, Inc.*, 5 F.Supp.2d 874 (D.Hawai'i 1998). *Pacific Adventures* involved a scuba diver who was run over by a boat carrying passengers to another dive expedition. She sued the operator of the boat that struck her and the company responsible for the dive expedition that she had taken. The federal district court ruled that the injured woman's action against her own divemaster stated a claim under maritime jurisdiction because her complaint

> include[d] allegations that [the divemaster] negligently selected a location to anchor, failed to display a proper dive flag, failed to communicate with another vessel, failed to mark the anchor line properly, and failed to keep or use adequate emergency equipment. These allegations involve the operation of a vessel and the failure to administer first aid, activities that establish a substantial relationship with traditional maritime activity.

*Id.* at 878. In addition, the Third Circuit in *Sinclair v. Soniform, Inc.*, 935 F.2d 599, 602 (3rd Cir.1991), has held that "the transport and care of passengers bears a substantial relationship to traditional maritime activity." *Sinclair* involved another scuba accident in which, due to equipment failure, a diver surfaced too rapidly and suffered decompression sickness. The crew administered no first aid and continued the dive for two and one-half hours after the diver surfaced and became ill. The Third Circuit noted that "[t]he injuries that Sinclair attributes to the crew relate to their duty to provide adequate care to an injured passenger, which is an integral part of the carriage of passengers." *Id.* at 603. *See also Price v. Price*, 929 F.2d 131, 133, 136 (4th Cir.1991) (holding that maritime jurisdiction "emanat[ed] from the navigation of a vessel" when the complaint alleged that the captain, in attempting to beach his boat, failed to anchor the boat

and position it properly for disembarking passengers to exit from the side, rather than the bow, and because he approached the shore too rapidly, causing a wake high enough to topple the victim).

Even if "navigation" of a vessel is too broad a definition for the appellee's activities in this case, there are other cases, which reflect that the individual components of appellee's actions constituted activities in substantial relation to traditional maritime activities. We have already mentioned *Pacific Adventures* and *Sinclair,* cases in which courts in other jurisdictions have found that failure to render first aid to a maritime passenger constituted an activity substantially related to traditional maritime activity. *See supra; see also Odeco Oil & Gas Co. v. Bonnette,* 4 F.3d 401, 403 n. 2 (5th Cir.1993) (holding that a botched man-overboard drill was "sufficiently salty to sustain admiralty jurisdiction"), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1370, 128 L.Ed.2d 47 (1994); *In re Kanoa, Inc.,* 872 F.Supp. 740, 745 n. 3 (D.Hawai'i 1994) ("[A]ny claims against the crew for failure to adequately respond to [an] emergency would be actionable under admiralty jurisdiction.").[7] We also note that *Pacific Adventures* and *Price,*

---

7. We also note that 46 U.S.C. §§ 2303, 2304 (1994), provide a general duty to render assistance to those injured or lost at sea. Section 2303, for instance, states in relevant part:

 **§ 2303. Duties related to marine casualty assistance and information**

 (a) The master or individual in charge of a vessel involved in a marine casualty shall—

 (1) render necessary assistance to each individual affected to save that affected individual from danger caused by the marine casualty, so far as the master or individual in charge can do so without serious danger to the master's or individual's vessel or to individuals on board; and

 ....

 (b) An individual violating this section or a regulation prescribed under this section shall be fined not more than $1,000 or imprisoned for not more than 2 years. The vessel also is liable in rem to the United States Government for the fine.

 Section 2304 adds:

 **§ 2304. Duty to provide assistance at sea**

 (a) A master or individual in charge of a vessel shall render assistance to any individual found at sea in danger of being lost, so far as

*supra,* both involved the allegedly improper positioning of a boat in relation to disembarking passengers. *See also In re Bird,* 794 F.Supp. 575, 581 (D.S.C.1992) ("[T]he anchoring of a boat in navigable waters is a traditional maritime activity."). In this case, when appellee abandoned his helm, he left his boat adrift in deep navigable waters during somewhat inclement weather. Those factors contributed to the difficulty he and Ms. Parks had in attempting to reboard the boat, and, more important, to the inability of Ms. Matthews to do the same.

In addition, there are cases applying maritime law to allegations of the failure of the boat operator to provide proper means of ingress and egress. Appellants, for instance, cite *White v. United States,* 53 F.3d 43 (4th Cir.1995), in which a security guard making rounds at a naval station disembarked from a naval vessel, stumbled and collided with equipment on the pier. The Fourth Circuit, in holding that maritime jurisdiction existed, noted that "[t]he general features of this incident may be described as injury to a person disembarking from a vessel in navigable water." *Id.* at 47. In *Butler v. American Trawler Co.,* 887 F.2d 20 (1st Cir.1989), *aff'g* 707 F.Supp. 29 (D.Me.1989), the plaintiff, while climbing aboard a ship via its rigging, because the ladder down to the boat was faulty, injured her finger. The First Circuit upheld the trial court's finding of maritime jurisdiction in the case, noting that "the boarding of a ship bears a significant relation to tradition-

---

the master or individual in charge can do so without serious danger to the master's or individual's vessel or individuals on board.

(b) A master or individual violating this section shall be fined not more than $1,000, imprisoned for not more than 2 years, or both. By citing these two provisions, we do not mean to indicate that appellee violated either law or that, more generally, either law establishes negligence per se in any given case. We only note that these provisions generally impose upon a boat captain, such as appellee, a duty to render assistance, and that failure to provide such assistance can subject the captain to federal criminal jurisdiction, and the boat, under section 2303, to federal admiralty jurisdiction in rem. In this case, appellants allege that appellee, as captain, failed to provide proper rescue measures and to properly aid in the efforts to rescue his passenger.

al maritime activities, for ... one does not normally board a ship in quite the same way one enters a building, an airplane, or a car." *Id.* at 21. The federal district court in *Butler*, 707 F.Supp. at 33, had also held that maritime law applied, in part because "[t]he gist of [Butler]'s complaint is that she was not provided a safe means of boarding, which failure was the proximate cause of her injury." *See also Christiansen v. Big Island Fish Connection, Inc.*, 885 F.Supp. 207, 209–10 (D.Hawai'i 1994) (finding that maritime jurisdiction existed when the relevant maritime activity was the boarding of a docked boat); *O'Hara v. Bayliner*, 89 N.Y.2d 636, 645, 657 N.Y.S.2d 569, 679 N.E.2d 1049, 1053–54 (holding that an injury to a disembarking passenger, caused by a defective cleat on an anchored boat was subject to maritime law), *cert. denied*, 522 U.S. 822, 118 S.Ct. 78, 139 L.Ed.2d 37 (1997).

A number of cases also indicate that the proper repair and maintenance of vessels fall within the panoply of "traditional maritime activities." *See, e.g., Grubart, Inc.*, 513 U.S. at 540, 115 S.Ct. at 1051, 130 L.Ed.2d 1024 (noting that once "characterized as repair or maintenance work on a navigable waterway ... there is no question that the activity is substantially related to traditional maritime activity...."); *Sisson*, 497 U.S. at 367, 110 S.Ct. at 2898, 111 L.Ed.2d 292 ("[S]toring and maintaining a vessel ... is substantially related to traditional maritime activity."); *White*, 53 F.3d at 48 (noting that guarding vessels docked for repairs and maintenance is substantially related to traditional maritime activity); *Bubla v. Bradshaw*, 795 F.2d 349, 352 (4th Cir.1986) (noting that, in a negligence claim for the onboard electrocution of a boat inspector, the case "touche[d] upon the maintenance and repair of seagoing vessels.... These concerns are maritime in nature."). Combining these two standards, i.e., providing proper means of ingress and proper repair and maintenance of vessels in general, we hold that maritime law applies to appellants' allegations that, having implicitly invited Ms. Matthews to get into the water by virtue of his doing so in her presence, appellee failed to adequately prepare for Ms. Matthews' re-boarding of his craft, and that he failed to supply or utilize, or

to direct others to utilize, the safety equipment necessary to rescue Ms. Matthews. In addition, maritime law applies to appellants' allegation that appellee failed to adequately warn Ms. Matthews (and the others) of the potential hazards to her safety. *See McClenahan v. Paradise Cruises, Ltd.*, 888 F.Supp. 120, 122 (D.Hawai'i 1995) (finding, in a case in which a number of divers received ear injuries during a "Snuba" (a cross between scuba and snorkeling) dive, that "maritime jurisdiction is also proper because Plaintiffs have alleged negligence for failure to warn and aid on the part of the vessel.").

### V. Did a Material Dispute of Fact Exist?

We have already noted, *supra*, the dispute in fact among the three witnesses in their depositions, namely as to whether appellee made sufficient efforts to attempt to rescue Ms. Matthews. This dispute in fact is material in that it may reflect on whether appellee breached any duty of care he may have owed Ms. Matthews as the captain of the vessel. There is also a dispute as to whether appellee disengaged the engines prior to abandoning his helm, which may also affect his liability under federal maritime law. Of course, the most apparent dispute of fact, disregarded by the trial court, is whether Ms. Matthews fell or jumped into the water. That fact is material to the proximate cause of Ms. Matthews' death and any negligence on her part. With these apparent material facts in dispute, it was improper for the trial court to grant summary judgment to appellee.

### VI. Conclusion

We hold that maritime law applies to the facts and allegations of this case. Thus, it was legally incorrect for the trial court to apply non-maritime law and rule that appellee owed no legal duty to rescue Ms. Matthews. Whatever duty of care appellee may have owed to the decedent is to be determined, on remand, under the federal maritime law. In addition, there was a dispute as to material facts before the circuit court, which the court failed to recognize. For both reasons,

it was inappropriate for the trial court to grant summary judgment to appellee. Accordingly, we reverse the order of the circuit court and remand for further proceedings.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**